[No. 51817-3.   En Banc.   August 27, 1987.]

THE CITY OF TACOMA, *Appellant,* v. THE TAXPAYERS OF THE CITY OF TACOMA, ET AL, *Respondents,* THE CITY OF SEATTLE, *Appellant.*

680

*Robert J. Backstein, Tacoma City Attorney,* and *William J. Barker, Chief Assistant; Douglas N. Jewett, Seattle City Attorney,* and *William H. Patton, Assistant; Joni H. Ostergaard* and *Roberts & Shefelman, Special Counsel,* for appellants Cities.

*Johnson, Lane & Crawford,* by *Joanne Henry,* for respondent Taxpayers.

*Cartano, Botzer, Larson & Birkholz,* by *J. Jeffrey Dudley* and *Thomas C. Armitage,* for respondent Washington Natural Gas Co.

UTTER, J.—The City of Tacoma appeals a trial court's declaratory judgment invalidating Tacoma's electrical energy conservation ordinance. The ordinance authorizes Tacoma's municipally owned utility company, Tacoma City Light, to issue electric revenue bonds and use other funds to invest in energy conservation measures installed in privately owned, electrically heated, residential and commercial structures located within the utility's service area. Although the trial court found Tacoma's conservation program authorized by RCW 35.92.050, the court invalidated the program as a gift of public funds prohibited by Const. art. 8, § 7. Accordingly, the trial court declared the conservation ordinance void and of no force and effect. While we

agree that RCW 35.92.050 authorizes the conservation program, we conclude that the trial court erred in characterizing the program as an unconstitutional gift. Consequently, we reverse and reinstate the conservation ordinance.

I

On May 17, 1984, the City of Tacoma, as plaintiff, filed a declaratory judgment action to determine the constitutional and statutory validity of its conservation ordinance (ordinance 23165). In addition to filing the action, Tacoma obtained orders appointing both a representative and an attorney for the taxpayers of the City of Tacoma (Tacoma Taxpayers). In June, the court entered orders permitting Public Utility District 2 of Grant County to intervene as a party plaintiff and the City of Seattle to intervene as a plaintiff–intervenor. In December, the court issued an order permitting Washington Natural Gas Company (WNG) to intervene as a defendant–intervenor, but the court restricted WNG's intervention to the issues raised by the pleadings of the existing parties.

The record compiled during a 3–week trial reveals that Tacoma and Seattle each own and operate an electrical utility, which serves residential and commercial customers both within and without city limits. At the present time, however, both cities are unable to meet present electricity demands, much less future load growth, and must purchase a portion of the electricity they require from the Bonneville Power Administration (BPA). Both cities have made legislative policy determinations to own or control the electric generating resources used to supply the needs of their electrical utility and its ratepayers, thereby reducing their reliance on purchased power.

For the last half century, hydroelectric projects, which utilize energy from falling waters, have been the prevailing method of producing electricity in the Pacific Northwest. Because of environmental concerns, Indian treaty rights, and the near exhaustion of available sites, significant hydroelectric resources are not available for development to

meet future electrical load growth. Consequently, Tacoma and Seattle must look to other resources to meet their anticipated growth. Possible electrical energy resources include thermal generating plants, cogeneration, and conservation. As to conservation, its importance as a source of electricity came into full focus with congressional enactment of the Pacific Northwest Electric Power Planning and Conservation Act, Pub. L. No. 96–501, 94 Stat. 2697 (1980) (codified at 16 U.S.C. § 839). Both the Pacific Northwest Electric Power and Conservation Planning Council (Regional Council) and the BPA consider conservation a resource of electrical energy equivalent to a generating plant. Finding of fact 22; Clerk's Papers, at 319–20. Various legislative enactments also consider conservation an energy resource. Finding of fact 23; Clerk's Papers, at 320.[1]

Tacoma and Seattle have adopted conservation programs as a consequence of legislative determinations that these programs will result in their utilities' acquisition of electricity by conservation. Section 4 of Tacoma's ordinance characterizes its conservation program as the "purchase [of] electrical energy produced as a result of the implementation of the plan and system of energy conservation adopted [by the ordinance]." Exhibit 8. The Tacoma ordinance requires participating ratepayers to (1) submit to an energy audit; (2) have installed only city–approved conservation measures by a city–approved contractor; and (3) before payment is received, have the installed measures inspected by Tacoma. The measure of payment is the cost of the conservation measures or an amount equal to 29.2 cents

---

[1]See, e.g., RCW 35.92.355 (encouraging conservation programs by Washington municipal corporations); RCW 39.35 (requiring employment of energy conservation practices and renewable energy systems in the design of major publicly owned or leased facilities); RCW 43.19.668–.685 (legislative finding that "state government should undertake an aggressive program designed to reduce energy use in state buildings, facilities, equipment, and vehicles" and instituting energy audits and installation of energy conservation measures for that purpose); RCW 28A.51.010(4) (authorizing school districts to borrow money for energy efficiency improvements); RCW 80.28.025 (rate of return increment allowed to utilities for conservation).

times the estimated first year's kilowatt–hour savings, whichever is less. Ratepayers participating in the program are under no obligation to repay the funds received. To finance the conservation program, the ordinance authorizes Tacoma to issue electric revenue bonds in the principal amount of $5 million and to use other City Light funds. The cities employ different methods for determining the cost effectiveness of conservation measures. Tacoma measures cost effectiveness against the present and projected costs of electricity purchased from BPA. Seattle's measuring standard is the present and projected costs of electricity purchased from a new regional thermal generating plant. Finding of fact 18; Clerk's Papers, at 319.

At the conclusion of a 3–week trial, the trial court found the purchase of conservation equivalent to the purchase of electricity or of a generating facility, and thus authorized by the municipal utility statute, RCW 35.92.050. Although the exact amount of energy saved was uncertain, the trial court found that studies indicated a range of 3,500 to 5,000 kilowatt–hours per residence. However, the court concluded that the amount of savings beyond the first year could not be predicted and that Tacoma had failed to show that the consideration it received was measurable and lasting. Consequently, even though Tacoma lacked donative intent, the trial court held that the lack of adequate consideration made the payments to ratepayers an unconstitutional gift of public funds.

WNG appealed to Division Two of the Court of Appeals, challenging the trial court's holding that Tacoma had statutory authority to enact a conservation program pursuant to RCW 35.92.050. Tacoma and Seattle cross–appealed directly to this court, challenging the trial court's holding that the Tacoma ordinance constituted an unconstitutional gift. This court assumed jurisdiction on July 18, 1986. Direct review is appropriate pursuant to RAP 4.2(a)(2) because the trial court held the Tacoma ordinance unconstitutional and pursuant to RAP 4.2(a)(4) because this case involves a fundamental issue of broad public import.

## II

At oral argument it became apparent that WNG did not have standing to bring its appeal. Only an "aggrieved party" may seek review of a trial court decision. RAP 3.1. At trial, the court rejected WNG's statutory authority challenge to Tacoma's conservation program, but did agree with WNG's contention that the program constituted an unconstitutional gift. On appeal, WNG asks this court to affirm the declaration of invalidity, but on statutory authority grounds, rather than as an unconstitutional gift. Because WNG merely objects to the reasoning by which the trial court invalidated the ordinance, WNG cannot be considered "aggrieved", and therefore does not have standing to appeal. *In re Estate of Lyman,* 7 Wn. App. 945, 953-54, 503 P.2d 1127 (1972), *aff'd,* 82 Wn.2d 693, 512 P.2d 1093 (1973). However, because Tacoma and Seattle brought a cross appeal, we regard WNG as a respondent along with Tacoma Taxpayers.

Although considered a respondent, rather than an appellant, WNG may nevertheless assign error to trial court findings, *Burt v. Heikkala,* 44 Wn.2d 52, 54, 265 P.2d 280 (1954), and may offer additional reasons in support of the judgment, even if the trial court rejected such reasoning. *Peterson v. Hagan,* 56 Wn.2d 48, 351 P.2d 127 (1960). We have therefore considered WNG's contention, unsupported by co-respondent Tacoma Taxpayers, that the trial court erred in finding the conservation program within Tacoma's statutory authority. Thus, the parties raise two issues: (1) whether the municipal utility enabling statute, RCW 35.92-.050, authorizes the purchase of cost effective conservation measures from ratepayers; and if the statutory authority exists (2) whether article 8, section 7 of the Washington Constitution prohibits such purchases as gifts of public funds. We hold that Tacoma's conservation program is both statutorily authorized and constitutionally permissible.

## III

As "creatures of statute," municipal corporations possess

only those powers conferred on them by the constitution, statutes, and their charters. 2 E. McQuillin, *Municipal Corporations* § 10.09 (3d ed. 1979). Tacoma's authority to enact its conservation program must derive from either an express grant or by necessary or fair implication from such a grant. *See Spokane v. J–R Distribs., Inc.,* 90 Wn.2d 722, 585 P.2d 784 (1978). The trial court held that RCW 35.92-.050 authorizes municipally owned utilities such as Tacoma City Light and Seattle City Light to purchase the electricity saved by cost–effective conservation measures.

WNG challenges the trial court's conclusion, asserting that municipalities may not undertake conservation programs unless such programs constitute loan financing as authorized under article 8, section 10 (amendment 70) of the Washington Constitution and its implementing statute, RCW 35.92.360. WNG further contends that this court has narrowly confined a municipal utility's statutory authority to the ordinary meaning of the terms used in RCW 35.92-.050. *See Chemical Bank v. WPPSS,* 99 Wn.2d 772, 666 P.2d 329 (1983) (*Chemical Bank* I).[2] According to WNG, under our *Chemical Bank* I approach, RCW 35.92.050 does not authorize the purchase of electricity in the form of conservation. We reject both of WNG's contentions, finding them to be based upon a misunderstanding of the intent underlying article 8, section 10 (amendment 70) and a misreading of our *Chemical Bank* I decision.

## A

The Washington Constitution prohibits gifts or loans of public money, except for the necessary support of the poor or infirm. Const. art. 8, § 7. In 1979, the People ratified a constitutional amendment creating a limited exception to the loan portion of the prohibition. Const. art. 8, § 10 (amend. 70). The amendment empowered the Legislature

---

[2] We refused to alter our *Chemical Bank* holding in a subsequent decision arising out of the same set of facts. *Chemical Bank v. WPPSS,* 102 Wn.2d 874, 691 P.2d 524 (1984), *cert. denied,* 471 U.S. 1065, 1075 (1985). To enhance clarity, we will refer to our earlier decision as *Chemical Bank* I.

to authorize municipal utilities to offer loan financing to owners of residential structures for the purpose of installing effective conservation materials and equipment.[3] In enacting enabling legislation implementing article 8, section 10, the Legislature created a comprehensive scheme requiring all conservation measures to be cost effective, setting out the specific conditions under which municipal utilities may offer loans to their residential customers. RCW 35.92.360. The People rejected a 1983 proposal to expand the loan program to include commercial and industrial utility customers. *See* Senate Joint Resolution 112.

█ Tacoma's conservation program does not purport to be a loan financing program authorized by Const. art. 8, § 10 and RCW 35.92.360. Rather, Tacoma asserts, and the trial court agreed, that RCW 35.92.050 authorizes Tacoma's conservation program as the reacquisition of electricity from one ratepayer to be offered for resale to another. WNG urges us to conclude that RCW 35.92.360 constitutes the exclusive manner by which a municipal utility may pursue conservation, and thus precludes RCW 35.92.050 from authorizing Tacoma's inconsistent program. To interpret article 8, section 10 and RCW 35.92.360, we must examine the legislative history and materials in the official voters pamphlet. *Port of Longview v. Taxpayers,* 85 Wn.2d 216, 232, 533 P.2d 128 (1974). These reveal that the People and the Legislature developed a limited exception to the constitution's loan prohibition, but did not intend to preclude conservation programs that might otherwise be

---

[3]Const. art. 8, § 10 (amend. 70) provides:

"Notwithstanding the provisions of section 7 of this Article, until January 1, 1990 any county, city, town, quasi municipal corporation, municipal corporation, or political subdivision of the state which is engaged in the sale or distribution of energy may, as authorized by the legislature, use public moneys or credit derived from operating revenues from the sale of energy to assist the owners of residential structures in financing the acquisition and installation of materials and equipment for the conservation or more efficient use of energy in such structures. Except as provided in section 7 of this Article, an appropriate charge back shall be made for such extension of public moneys or credit and the same shall be a lien against the residential structure benefited. . . ."

authorized.

In 1979, the Legislature submitted amendment 70 to the People in the belief that article 8, section 7 prohibited the use of municipal utility funds for conservation grants or loans. See Substitute Senate Joint Resolution 120. The Legislature reached this conclusion by relying on an Attorney General opinion, which predicted that this court would hold article 8, section 7 prohibited municipal utility conservation loans or grants. AGLO 4 (1979). As a result, the People were also informed that the constitution prohibited municipal utilities from giving funds or extending credit to ratepayers for conservation purposes. Voters Pamphlet 16 (1979). Soon after ratification, we explicitly recognized that the Legislature proposed amendment 70, and the People ratified it, for the limited purpose of carving out an exception to the lending of credit prohibition in anticipation that this court would hold public utility energy conservation loans as violative of article 8, section 7. *State Health Care Facilities Auth. v. Ray*, 93 Wn.2d 108, 115, 605 P.2d 1260 (1980).

■■ Contrary to WNG's assertion, legislative history does not demonstrate that the Legislature considered expenditure of utility funds for conservation without payback as violative of article 8, section 7. The Legislature acted in anticipation of what this court would do, not on the basis of its own independent determination as to the constitutionality of direct purchase conservation. Moreover, whether expenditure of municipal utility funds for conservation without payback requirements violates the constitution is a question for this court to decide, not for the Legislature or the Attorney General. As we have repeatedly recognized, the judiciary has the exclusive function of determining the constitution's meaning, and the Legislature cannot define what is and is not a proscribed gift or loan under the state constitution. *Scott Paper Co. v. Anacortes*, 90 Wn.2d 19, 33, 578 P.2d 1292 (1978).

Much has changed since the Legislature predicated its actions on a prediction of this court's attitude toward the

constitutionality of conservation expenditures. In 1979, use of utility funds for conservation was characterized as either grants or loans.[4] A full appreciation of conservation's role as an electrical energy resource had not yet developed. Congress had not yet enacted the Pacific Northwest Electric Power Planning and Conservation Act, Pub. L. No. 96–501, 94 Stat. 2697 (1980) (codified at 16 U.S.C. § 839).[5] The full extent of conservation's potential as an energy resource would not come into full focus until 1983, with the Pacific Northwest Electric Power and Conservation Planning Council's publication of the first Northwest Conservation and Electric Power Plan.[6]

WNG argues further that the comprehensive scheme set down in RCW 35.92.360 makes it inconceivable for RCW 35.92.050 to authorize an inconsistent conservation program such as the purchase of conservation directly from ratepayers, unless the Legislature acted to delineate specific conditions. WNG fails to appreciate the inherent differences between loans of public funds and use of utility funds to purchase conservation. With loans, the Legislature must concern itself with conditions, such as the term of the loan and the method of repayment. *See* RCW 35.92.360(5). The very nature of a loan required the Legislature to list condi-

[4]In 1979, the most visible conservation program models were loan programs of the type approved by the Washington Utilities and Transportation Commission, and offered by investor–owned electrical utilities. See causes U–78–45, U–78–46.

[5]The act defines "resource" to include an "actual or planned load reduction resulting from direct application of a renewable energy resource by a consumer, or from a conservation measure." 16 U.S.C. § 839a(19)(B) (1982).

[6]In its first regional energy plan, the Regional Council concluded that conservation could free up enough electricity to supply up to 17 percent of the Northwest's electrical energy needs, which equals 4,790 megawatts, the equivalent of 4.7 nuclear power plants. 1 Northwest Power Planning Coun., *Northwest Conservation and Electric Power Plan* 7–13, table 7–5 (1983). Most recently, the Regional Council "has identified close to 3,700 average megawatts of conservation . . . at an average cost of 2.4 cents per kilowatt–hour—enough energy to replace more than eight coal plants, at about half the cost." (Footnote omitted.) 1 Northwest Power Planning Coun., *Northwest Conservation and Electric Power Plan* 6–1 (1986).

tions that would assure cost effectiveness and proper installation, RCW 35.92.360(1)–(4); once the constitution authorizes conservation loans, no outside factors would dictate the cost–effective requirement. In contrast, unless demonstrated as cost effective, Tacoma's direct purchase program would run afoul of the article 8, section 7 gift prohibition. Moreover, a municipal utility, like any other business, is subject to market forces, and thus has disincentives to investing its own money in measures that are improperly installed and not cost effective.

We also reject WNG's invocation of a basic rule of statutory construction, requiring a specific statute to control a statute of general application. *See, e.g., Sim v. State Parks & Rec. Comm'n,* 90 Wn.2d 378, 382, 583 P.2d 1193 (1978). According to WNG, section .360 precludes section .050 from authorizing Tacoma's admittedly inconsistent program because section .360 sets forth a specific, comprehensive scheme governing conservation financial assistance to ratepayers, while section .050 is nothing more than a general grant of authority. However, this court gives preference to a more specific statute *only* if the two statutes deal with the same subject matter and they have an apparent conflict. *In re Estate of Little,* 106 Wn.2d 269, 284, 721 P.2d 950 (1986). Moreover, we have often recognized our responsibility to harmonize statutes if at all possible, so that each may be given effect. *See, e.g., In re Mayner,* 107 Wn.2d 512, 522, 730 P.2d 1321 (1986).

Here, as the trial court concluded, no conflict exists between RCW 35.92.360 and .050. In enacting RCW 35.92-.360, the Legislature had to conform to the limited grant of authority contained in amendment 70. As a result, section .360 could *only* create a comprehensive scheme authorizing municipal utilities to provide loans for conservation measures. Even with its mandate limited, the Legislature still took the opportunity to demonstrate that it contemplated other types of authorized conservation expenditures, explicitly requiring payback of municipal funds "*[e]xcept where otherwise authorized*". (Italics ours.) RCW 35.92.360.

As a result, amendment 70 and section .360 must be viewed as merely controlling conservation loan programs. Tacoma does not seek to offer financing or financial assistance, but rather claims authorization under RCW 35.92.050 to reacquire the electricity saved through conservation. See Clerk's Papers, at 321–22. While both deal with conservation, direct purchase of conservation–produced electricity differs significantly from loan financing programs. Thus, if "otherwise authorized" by section .050, Tacoma's direct purchase program does not conflict with amendment 70 and section .360.

We recognize that in construing the various provisions of RCW 35.92, we must insure that no portion is made superfluous. *See Sim v. State Parks & Rec. Comm'n, supra.* However, if we determine that section .050 authorizes Tacoma's action, section .360 does not become superfluous as WNG contends. The two statutes would provide municipal utilities with choices for pursuing conservation. As the trial court correctly reasoned, if municipal utilities choose to help ratepayers finance conservation measures, they need only adopt a loan program that conforms with amendment 70 and section .360. Oral Decision of the Court; Clerk's Papers, at 305–06. On the other hand, to pursue conservation as an electrical resource under RCW 35.92.050, a municipal utility would have to specifically intend to purchase electricity, which would require supporting studies, and generally have more to back up its program than a desire to make a loan or provide assistance. Oral Decision of the Court; Clerk's Papers, at 305–06.

In sum, the People ratified amendment 70, and the Legislature enacted RCW 35.92.360, for the limited purpose of creating a narrow exception to the article 8, section 7 loan prohibition. No attempt was made to limit municipal utility conservation programs that might otherwise be authorized. *See* RCW 35.92.360. Conservation loan financing programs must be consistent with the conditions set out in RCW 35.92.360. Tacoma City Light, however, does not purport to offer financial assistance to its customers. Rather, it seeks

to increase its available supply of electricity by purchasing back the electricity saved through conservation measures. Whether RCW 35.92.050 authorizes Tacoma's conservation purchase program, and whether such a program constitutes an unconstitutional gift, are questions totally separate from, and uninfluenced by, the ratification of amendment 70 and the enactment of RCW 35.92.360.

### B

As a municipal corporation, Tacoma's authority is limited to those powers expressly granted and to powers

> necessarily or fairly implied in or incident to the powers expressly granted, and also those essential to the declared objects and purposes of the corporation. . . . If there is a doubt as to whether the power is granted, it must be denied.

*Port of Seattle v. State Utils. & Transp. Comm'n*, 92 Wn.2d 789, 794–95, 597 P.2d 383 (1979); 1 J. Dillon, *Municipal Corporations* § 237 (5th ed. 1911). As Judge Dillon recognized in formulating the above rule, the rule of strict construction does not apply to the mode or means a municipal corporation uses to carry out its grant of power. 1 J. Dillon § 239. In RCW 35.92.050, the Legislature granted municipalities authority to acquire and operate electric utilities.[7] More specifically, RCW 35.92.050 provides:

> A city or town may also construct, condemn and purchase, purchase, acquire, add to, alter, maintain and operate works, plants, facilities for the purpose of furnishing the city or town and its inhabitants, and any other persons, with gas, electricity, and other means of power and facilities for lighting, heating, fuel, and power purposes, public and private, with full authority to regulate and control the use, distribution, and price thereof . . .; authorize the construction of such plant or plants

---

[7] As a first class city, Tacoma also has authority "[t]o provide for lighting the streets and all public places, and for furnishing the inhabitants thereof with gas or other lights, and to erect, or otherwise acquire, and to maintain the same, or to authorize the erection and maintenance of such works as may be necessary and convenient therefor, and to regulate and control the use thereof;". RCW 35.22-.280(15).

by others . . . and purchase . . . electricity, or power from either within or without the city or town for its own use and for the purpose of selling to its inhabitants and to other persons doing business within the city or town and regulate and control the use and price thereof.

■ The trial court held that RCW 35.92.050 authorized Tacoma's conservation program. Although the court realized that the traditional meaning of the individual powers granted in section .050 may not include conservation, in the world of electric utility professionals an investment in conservation is considered the equivalent of purchasing electricity or of purchasing an electric generating facility. Findings of fact 11, 22–25. WNG urges us to reject the trial court's interpretation and to construe RCW 35.92.050 using a standard rule of statutory construction: unambiguous words within a statute which are not defined therein should be given their ordinary meaning. *See King Cy. Coun. v. Public Disclosure Comm'n,* 93 Wn.2d 559, 561, 611 P.2d 1227 (1980). WNG argues that conservation does not come within the ordinary meaning of the statutory language, which merely conveys the power to "purchase" "electricity" or "generating facilities" for the purposes of "resale." We reject such a simplistic approach. A mechanistic use of statutory construction rules would lead us astray from our paramount duty, which is "to ascertain and give expression to the intent of the Legislature." *Service Employees, Local 6 v. Superintendent of Pub. Instruction,* 104 Wn.2d 344, 348, 705 P.2d 776 (1985). When we seek to determine the meaning of words used but not defined within a statute, we give careful consideration to the subject matter involved, the context in which the words are used, and the purpose of the statute. *See, e.g., State v. Stockton,* 97 Wn.2d 528, 533, 647 P.2d 21 (1982).

■ Like other state supreme courts, we have historically taken different approaches to construing municipal powers according to whether the power exercised is governmental or proprietary in nature. *See, e.g., PUD 1 v. Newport,* 38 Wn.2d 221, 227, 228 P.2d 766 (1951); 2 E. McQuillin,

*Municipal Corporations* § 10.22 (3d ed. 1979). When a governmental function is involved, less opportunity exists for invoking the doctrines of liberal construction and of implied powers. *Newport,* at 227.[8] But when the Legislature authorizes a municipality to engage in a business, "[it] may exercise its business powers very much in the same way as a private individual . . ." *Newport,* at 227. Actions taken pursuant to RCW 35.92.050 serve a business, proprietary function, rather than a governmental function. *State v. O'Connell,* 83 Wn.2d 797, 834, 523 P.2d 872 (1974); *Newport,* at 227; *Seattle v. Stirrat,* 55 Wash. 560, 564–66, 104 P. 834 (1909). Since 1910, we have broadly construed the means a municipality may use to conduct a statutorily authorized business.[9] We have viewed the Legislature as implicitly authorizing a municipality to make all contracts, and to engage in any undertaking necessary to make its

---

[8]Even in cases of governmental functions, we tailor our approach to statutory construction according to certain factors. Thus, we liberally construe municipal governmental function authority when (1) we find that legislative intent underlying an express statutory grant of power requires us to do so; (2) first class or code cities are involved; and (3) when the exercise of authority is pursuant to the police powers. Note, *A Cry for Reform in Construing Washington Municipal Corporation Statutes,* 59 Wash. L. Rev. 653, 655 (1984). However, we have employed a narrow construction to municipal exercises of the eminent domain power. *See, e.g., In re Seattle,* 96 Wn.2d 616, 629, 638 P.2d 549 (1981). For municipalities to exercise the power to tax, we require specific express statutory authority. *Hillis Homes, Inc. v. Snohomish Cy.,* 97 Wn.2d 804, 809, 650 P.2d 193 (1982).

[9]*See Tacoma v. Nisqually Power Co.,* 57 Wash. 420, 433, 107 P. 199 (1910) (broadly construed power to operate electric utility as extending power to condemn and purchase to acquiring existing private utility); *Chandler v. Seattle,* 80 Wash. 154, 141 P. 331 (1914) (broadly construed power to provide lighting as encompassing power to supply electricity); *Tacoma v. State,* 121 Wash. 448, 209 P. 700 (1922) (authority to operate utilities conferred "broad powers upon cities"); *Seattle v. Faussett,* 123 Wash. 613, 212 P. 1085 (1923) (broadly construed power to condemn and acquire conferred in authority to operate a utility); *McCormacks, Inc. v. Tacoma,* 170 Wash. 103, 107, 15 P.2d 688 (1932) (city has power to conduct its light business in a reasonable manner); *Armstrong v. Seattle,* 180 Wash. 39, 38 P.2d 377, 97 A.L.R. 826 (1934) (broadly construed power to operate stone or asphalt plant as including power to condemn despite absence of express words to that effect); *Metropolitan Seattle v. Seattle,* 57 Wn.2d 446, 460, 357 P.2d 863 (1960) (authority to provide sewer system implies authority to pay another to do so).

municipal electric utility system efficient and beneficial to the public. *See Municipal League of Bremerton, Inc. v. Tacoma,* 166 Wash. 82, 88, 6 P.2d 587 (1931); *Puget Sound Power & Light Co. v. PUD 1,* 17 Wn. App. 861, 864, 565 P.2d 1221 (1977). In addition, we have traditionally viewed an express grant of proprietary authority as implying those "powers . . . necessarily or fairly implied in or incident to [express powers] and also those essential to the declared objects and purposes of the [municipal] corporation." *Port of Seattle v. State Utils. & Transp. Comm'n,* 92 Wn.2d 789, 794–95, 597 P.2d 383 (1979).

Of course, Tacoma's municipal utility authority has limits. In exercising its proprietary power, Tacoma may not act beyond the purposes of the statutory grant of power, *State ex rel. PUD 1 v. Wylie,* 28 Wn.2d 113, 182 P.2d 706 (1947), or contrary to express statutory or constitutional limitations. *Metropolitan Seattle v. Seattle,* 57 Wn.2d 446, 459–60, 357 P.2d 863 (1960); 12 E. McQuillin § 35.35. Thus, if municipal utility actions come within the purpose and object of the enabling statute and no express limitations apply, this court leaves the choice of means used in operating the utility to the discretion of municipal authorities. We limit judicial review of municipal utility choices to whether the particular contract or action was arbitrary or capricious, *see, e.g., State ex rel. PUD 1 v. Schwab,* 40 Wn.2d 814, 829–31, 246 P.2d 1081 (1952), or unreasonable, *see, e.g., McCormacks, Inc. v. Tacoma,* 170 Wash. 103, 107, 15 P.2d 688 (1932).

The record abundantly demonstrates the wisdom of Tacoma's decision to pursue conservation as an electric power resource.[10] Consequently, RCW 35.92.050 authorizes

---

[10]We note in passing that Tacoma does not claim authority to operate a separate business. On several occasions, we have rejected the contention that the legislative purpose in granting authority to operate one business impliedly conveys the authority to operate a separate, but necessarily incident, business. *Port of Seattle v. State Utils. & Transp. Comm'n,* 92 Wn.2d 789, 794, 597 P.2d 383 (1979). The Port of Seattle had claimed authority to operate its own ground transportation business (airporter service) pursuant to its authority under RCW

Tacoma's conservation program if the program bears a sufficiently close nexus to the purpose and object the Legislature intended to serve in granting the power to operate an electric utility. The grant of authority now codified in RCW 35.92.050 has remained virtually unchanged since its original enactment in 1890, Laws of 1890, § 1, p. 520; and reenactment in 1909, Laws of 1909, ch. 150, § 1, p. 580. The purpose was clear: to grant municipalities authority to "conduct and operate utilities." In 1909, the policy underlying legislative authorization of municipal utilities was the belief that municipalities could provide lower cost and more efficient electrical service. 3 J. Dillon § 1291, at 2094 (5th ed. 1911). This court has consistently viewed section .050's primary purpose as supplying electricity to the municipal corporation and its inhabitants. *See Chemical Bank* I, at 789; *Wylie,* at 126. Municipal utilities have a duty to provide low cost, efficient service. *See Municipal League of Bremerton, Inc. v. Tacoma,* 166 Wash. 82, 88, 6 P.2d 587 (1931); *Puget Sound Power & Light Co.,* 17 Wn. App. at 864.

■ The record developed through a 3–week trial amply established the close nexus between the legislative purpose and Tacoma's conservation program. See findings of fact 7–12, 22–25, 28; Clerk's Papers, at 317–21. Installation of conservation measures frees up electricity supplies for sale to other customers, thereby furthering the efficient provision of low cost energy and providing for future needs. Moreover, because of the heavy environmental and financial costs of thermal generating resources (*i.e.,* nuclear and coal powered plants), municipal utilities must be allowed to pursue conservation, a resource that offers the cheapest and

---

53.08.020 to control and operate Sea–Tac Airport. We rejected the Port's contention, holding that an airporter service business was neither implied in, nor within the purposes of, the legislative grant of authority contained in RCW 53.08.020. *Port of Seattle,* at 794–96. Our decision in *Port of Seattle* conformed with a much earlier decision, where we held that the authority to organize a port district does not include authority to operate a separate belt railway line business. *State ex rel. Huggins v. Bridges,* 97 Wash. 553, 166 P. 780 (1917).

cleanest alternative for meeting future electrical supply needs.

WNG asserts that Tacoma's conservation program is unauthorized because it does not produce any power for use or resale. This argument contradicts the views of utility professionals, the Congress, the Bonneville Power Administration, the Regional Council, and the Legislature. See findings of fact 22–23; Clerk's Papers, at 319–20. Today, the almost universally held view is that

> [a] kilowatt–hour saved from existing demand is as fully a source of new supply as another kilowatt–hour generated from the utility's next planned new plant. In both cases the utility makes available to the entire customer system a kilowatt–hour that was previously unavailable.

Schroeder & Miller, *The Validity of Utility Conservation Programs According to Generally Accepted Regulatory Principles,* 3 Solar L. Rep. 967, 1008 (1982). The Legislature implicitly reached the same conclusion by enacting RCW 80.28.025, which authorizes investor–owned utilities to earn a rate of return on conservation investments on an equal footing with investments in other sources of electric energy. *See* RCW 80.28.025.

We also reject WNG's contention that this court adopted an absolute literal approach to the scope of authority granted by RCW 35.92.050 in *Chemical Bank v. WPPSS,* 99 Wn.2d 772, 666 P.2d 329 (1983) (*Chemical Bank* I). There, this court held that municipal utilities did not have authority to enter into guaranteed contracts to purchase the potential output of yet to be constructed nuclear plants. *Chemical Bank* I, at 798. What the court found objectionable was the "dry hole" contract provision, which obligated the participating municipal utilities to pay their proportionate shares of the nuclear power costs *whether or not the plants were ever completed, operable, or operating. Chemical Bank* I, at 778. The court concluded that the purchase of project capacity could not qualify as electricity when accompanied by "[t]he unconditional obligation to pay for *no electricity*", which the court concluded "is

hardly the purchase of electricity." (Italics ours.) *Chemical Bank* I, at 784.

To reach its conclusion, the *Chemical Bank* I court did not resort to maxims of statutory construction requiring literal interpretation of statutory terms. Instead, the inquiry focused on what utility actions "qualified" as the purchase of electricity, *Chemical Bank* I, at 784, and what measure of control would be the "equivalent" of ownership, *Chemical Bank* I, at 787. Use of terms like "qualify" and "equivalent" would be inappropriate had the *Chemical Bank* I court opted for a literal, ordinary meaning approach. Rather, the court concluded that the express proprietary authority to supply residents with electricity did not include the power to unconditionally guarantee to pay for no electricity. *See Chemical Bank* I, at 799.

The *Chemical Bank* I court did, however, apply a strict construction approach to determine if municipal utilities had the implied power to enter into contracts containing these "dry hole" provisions. *Chemical Bank* I, at 792. The court viewed the issue presented as the power of municipal utilities to avoid statutory protections when incurring indebtedness by way of an unconditional guaranty of repayment. *See Chemical Bank* I, at 798. Viewing the issue as the power to incur indebtedness to pay for municipal services, the court found it necessary to apply a "more stringent" governmental functions approach used in public indebtedness and taxation cases. Thus, to analyze the implied power issue, the court invoked a strict "legal necessity" test employed when municipalities impose taxes without express authority. *Chemical Bank* I, at 792 (citing *Hillis Homes, Inc. v. Snohomish Cy.,* 97 Wn.2d 804, 808, 650 P.2d 193 (1982)).

Having characterized the "dry hole" provision as an "elaborate financing arrangement that required the participants to guarantee bond payments irrespective of whether the plant was ever completed", *Chemical Bank* I, at 798, it is understandable why the court felt compelled to apply a stricter governmental function approach. When a munici-

pality acts to further its governmental function, it exercises authority as an arm of the state, and has express powers to tax, spend, incur indebtedness, police, and take regulatory action. These express powers involve some element of sovereignty conferred by the Legislature, and therefore should be more strictly construed to minimize the encroachment on citizens' substantive rights and liberties. *See* Note, *Chemical Bank v. Washington Public Power Supply System: The Questionable Use of the Ultra Vires Doctrine To Invalidate Governmental Take–or–Pay Obligations,* 69 Cornell L. Rev. 1094, 1104 (1984).

By contrast, legislative grants of express proprietary authority do not convey any elements of sovereignty. In most cases exercises of proprietary power are less likely to affect citizens' substantive rights. Consequently, "courts will not interfere with the manner in which the [proprietary] power is exercised [if it is] exercised in good faith and for a proper municipal purpose." 3 J. Dillon, *Municipal Corporations* § 1296, at 2114–15 (5th ed. 1911). In *Chemical Bank* I, however, the court considered the "dry hole" provision as a financing scheme under which the municipal utilities had no real management control or ownership, but which committed ratepayers to a huge financial risk irrespective of whether the plants produced any electricity. *Chemical Bank* I, at 798. Because it perceived the issue to be the municipal utility's authority to incur and unconditionally guarantee indebtedness "based upon general grants of authority to provide services", *Chemical Bank* I, at 792, the court applied the more stringent governmental function approach.

Here, however, we find it unnecessary to apply the approach used in *Chemical Bank* I. Tacoma's conservation program has none of the dry hole provision characteristics that triggered the stricter governmental function approach. Unlike the dry hole provisions, the purchase of electricity in the form of conservation is not an elaborate financing arrangement. Payment to the ratepayer specifically depends upon the predicted amount of electricity saved in

the first year. No one challenges the trial court finding that the first year's electricity savings range from 3,500 to 5,000 kilowatts. In addition, under the contracts at issue in *Chemical Bank* I, the utilities "virtual[ly] abdicat[ed] all management functions and policy decisions" to a third party. *Chemical Bank* I, at 788. By contrast, Tacoma's conservation program calls for total management control over the selection of conservation measures, the method of installation, the identity of the installation contractor, and the quality of installation work. Finally, unlike nuclear power plants, conservation is the type of electrical resource capable of being brought on line incrementally, as needed. *See* 1 Northwest Power Planning Coun., *Northwest Conservation and Electric Power Plan* 6-1 (1986). Thus, the ratepayer is subjected to at most a minimum economic risk, unlike the dry hole provisions, which committed ratepayers to an "enormous" financial risk, irrespective of whether the plants ever produced electricity. *Chemical Bank* I, at 788.[11]

Pursuant to RCW 35.92.050, Tacoma has proprietary authority to own and manage an electric utility and to purchase and sell power from "within or without" the city for its own use or for resale to its electric utility customers. Unlike the dry hole contracts at issue in *Chemical Bank* I, Tacoma's proposed investment in the conservation resource comes within the intent and purpose underlying RCW 35.92.050. No statutory provision expressly limits or conflicts with Tacoma's program and Tacoma's conservation program has not been shown to be arbitrary or capricious, or unreasonable. Consequently, under our traditional approach to proprietary authority, we hold as the trial court did, that RCW 35.92.050 authorizes Tacoma's conservation program.

---

[11]WPPSS employed this financing scheme because investors perceived nuclear plants as extremely high risks; without dry hole provisions, WPPSS could not market its bonds at commercially feasible rates. Note, 69 Cornell L. Rev., at 1096; Comment, *Chemical Bank v. WPPSS: A Case of Judicial Meltdown*, 5 J. Energy L. & Pol'y 273, 281 (1982).

## IV

Having resolved the statutory authorization issue in Tacoma's favor, we now turn to whether the conservation program constitutes an unconstitutional gift of public funds. Under the relevant constitutional language, a municipality is prohibited from giving any money to or in aid of any individual, association, company or corporation, except for the poor and infirm. Const. art. 8, § 7.[12] The trial court concluded that despite an absence of donative intent, the conservation purchase program constituted a gift because the bargained–for consideration was not shown to be measurable and lasting. Finding of fact 27; conclusion of law 8; Clerk's Papers, at 321–22. However, the trial court's analysis is inconsistent with this court's most recent requirements for analyzing challenges based on article 8, section 7. *See Adams v. UW*, 106 Wn.2d 312, 722 P.2d 74 (1986). Consequently, we reverse the trial court and hold that Tacoma's program does not constitute an unconstitutional gift.

In adopting article 8, section 7, and its counterpart, article 8, section 5,[13] the framers intended to prevent the harmful "effects on the public purse of granting public subsidies to private commercial enterprises, primarily railroads." *Marysville v. State*, 101 Wn.2d 50, 55, 676 P.2d 989 (1984); *see* Reich, *Lending of Credit Reinterpreted: New Opportunities for Public and Private Sector Cooperation,*

---

[12]In its entirety, Const. art. 8, § 7 provides:

"No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation."

[13]Const. art. 8, § 5 provides:

"The credit of the state shall not, in any manner be given or loaned to, or in aid of, any individual, association, company or corporation." Despite differences in wording, we interpret article 8, sections 5 and 7 identically, construing them to contain similar prohibitions and exceptions. *See, e.g., Adams v. UW*, 106 Wn.2d 312, 326–27, 722 P.2d 74 (1986); *Morgan v. Department of Social Sec.*, 14 Wn.2d 156, 127 P.2d 686 (1942).

19 Gonz. L. Rev. 639 (1984). In recent years, we have narrowed our application of the gift prohibition, in an attempt to limit its scope to the evils the framers sought to prevent. *See Marysville,* at 55.[14] No unconstitutional gift of public property occurs when funds are expended as entitlement payments, made by the government in carrying out its fundamental purposes. *Seattle v. State,* 100 Wn.2d 232, 240–42, 668 P.2d 1266 (1983) (plurality opinion); Spitzer, *An Analytical View of Recent "Lending of Credit" Decisions in Washington State,* 8 U. Puget Sound L. Rev. 195, 199, 208–09 (1985).[15] Outside of expenditures for fundamental governmental purposes, we focus on two factors to determine if a gift occurs: consideration and donative intent. *General Tel. Co. v. Bothell,* 105 Wn.2d 579, 587, 716 P.2d 879 (1986); *Louthan v. King Cy.,* 94 Wn.2d 422, 428, 617 P.2d 977 (1980).

Because Tacoma enacted its conservation program pursuant to proprietary authority, we determine whether a gift has occurred by employing our donative intent/consideration analysis. Tacoma's program must be presumed constitutionally valid, and the burden of overcoming that presumption lies with those challenging Tacoma's authority. *State Housing Fin. Comm'n v. O'Brien,* 100 Wn.2d 491, 495–96, 671 P.2d 247 (1983). To meet their burden, Tacoma Taxpayers and WNG must demonstrate that Tacoma's conservation program amounts to "a transfer of property without consideration and with donative intent." *General*

---

[14]A similar narrowing has occurred in our lending of credit cases. Note, *State Lending of Credit—New Analysis of State Constitutional Prohibitions,* 61 Wash. L. Rev. 263, 264–66 (1986).

[15]We defined entitlements as "a form of assistance provided to the public, or a segment of the public, as cash or services, in carrying out a program to further an overriding public purpose or satisfy a moral obligation." *Seattle v. State,* 100 Wn.2d 232, 241, 668 P.2d 1266 (1983). Examples of entitlement payments include: payments for day–care services, vaccinations, fare–free bus zones, crime victim compensation, and relocation assistance payments to people or businesses displaced by condemnation. *Seattle,* at 242. Although many of these "entitlement" payments involve private benefit, the "overriding public purpose" makes any private benefit "incidental." *Seattle,* at 241.

*Tel. Co. v. Bothell,* 105 Wn.2d 579, 588, 716 P.2d 879 (1986). We use the donative intent element to determine how closely we scrutinize the sufficiency of the consideration, "the key factor." *Adams v. UW,* 106 Wn.2d 312, 327, 722 P.2d 74 (1986). "Unless there is proof of donative intent *or* a grossly inadequate return, courts do not inquire into the adequacy of consideration." (Italics ours.) *Adams,* at 327; *see Scott Paper Co. v. Anacortes,* 90 Wn.2d 19, 32–33, 578 P.2d 1292 (1978). Absent a showing of donative intent or gross inadequacy, trial courts should only apply a legal sufficiency test, under which a bargained–for act or forbearance is considered sufficient consideration. *Adams,* at 327.

*Adams* is dispositive in the case at hand. Here there is no allegation of gross inadequacy and the trial court's conclusion that Tacoma lacked donative intent remains unchallenged. Conclusion of law 8; Clerk's Papers, at 322. The trial court concluded that the consideration Tacoma bargained for was the electricity saved through the installation of conservation measures. Conclusion of law 9. Under *Adams,* the trial court should have limited its inquiry to whether the bargained for consideration was legally sufficient. Instead, despite finding that it was within Tacoma's legislative authority to determine what measure of cost effectiveness to use, the trial court conducted an in–depth analysis of the statistical assumptions underlying Tacoma's program, and compared the relative economic adequacy of the consideration exchanged. Findings of fact 17–21; Clerk's Papers, at 318–19. To allow trial courts to delve this deep into the choice of methodology intrudes upon Tacoma's power to make its own legislative judgment. As we recognized in *Adams,* absent donative intent or grossly inadequate consideration, examination of the adequacy of governmental transactions would constitute impermissible interference and "establish a burdensome precedent for future court calendars". *Adams,* at 327.

In effect, the trial court found that under Tacoma's program somewhere between 3,500 and 5,000 kilowatt hours of

electricity would be saved in the first year following installation, but over the long term it was uncertain how much electricity would be saved year to year. Findings of fact 19–20; Clerk's Papers, at 319. Under *Adams,* the first year's savings would constitute constitutionally sufficient consideration. The inability to predict the actual savings over the long run, and the specific concerns listed by the trial court, seem inherent in any prediction of long–term cost effectiveness.[16] The Legislature has already indicated its willingness to rely on predictions of future cost effectiveness. *See* RCW 35.92.360 (authorizing loans for cost–effective conservation measures); RCW 80.28.025 (authorizing investor–owned utilities to earn a rate of return on cost–effective conservation investment).

Under Tacoma's program the amount of payment to the participating ratepayer depends upon the 3,500–5,000 kilowatts of electricity to be saved in the first year after installation. This feature distinguishes Tacoma's program from cases where we found insufficient consideration. For example, in one case we invalidated as an unconstitutional gift a port district's promotional hosting of potential customers. *State ex rel. O'Connell v. Port of Seattle,* 65 Wn.2d 801, 399 P.2d 623 (1965). There, private individuals had no legal obligation and the only public benefit was the potential business that may have resulted from the hosting program. *O'Connell,* at 804. As we have seen, no one challenges the fact that the Tacoma program produces savings in the first year. This actual savings also distinguishes this case from others where we expressed the view that a generalized public benefit is not sufficient consideration. *See Adams,* at 326.

Finally, any benefit received by the private participating ratepayers, in the form of lower utility bills and a small

---

[16]These concerns included the amount by which the electricity saved would decline over the life of the conservation measures, the effect of the loss in utility revenue caused by a decrease in usage, and the uncertainty as to what extent BPA's rates will increase in the future. Findings of fact 18–20; Clerk's Papers, at 319.

potential increase in property values, is incidental to the public benefit derived from reducing dependence on outside electrical sources and supplying future load requirements using the electricity saved. "Aid to individuals is not absolutely prohibited under our law but is only improper where public money is used solely for private purposes." *State v. Ralph Williams' North West Chrysler Plymouth, Inc.*, 82 Wn.2d 265, 277, 510 P.2d 233, 59 A.L.R.3d 1209 (1973). Where the public receives sufficient consideration, and benefit to an individual is only incidental to and in aid of the public benefit, no unconstitutional gift has occurred. *Seaboard Sur. Co. v. Ralph Williams' Northwest Chrysler Plymouth, Inc.*, 81 Wn.2d 740, 746, 504 P.2d 1139 (1973); see also *Seattle v. State, supra* at 242–44.

## V

Because we find Tacoma's conservation program authorized under RCW 35.92.050, we affirm the trial court as to the statutory authorization issue. We conclude, however, that under its conservation purchase program, Tacoma receives constitutionally sufficient, bargained–for consideration. Thus, no unconstitutional gift has occurred. We therefore reverse the trial court's declaration of invalidity and reinstate Tacoma's conservation ordinance.

PEARSON, C.J., and BRACHTENBACH, DORE, and DURHAM, JJ., concur.

GOODLOE, J. (dissenting)—The court's focus in this appeal is not on the merits of conservation. Indeed, conservation is laudable and should be encouraged. However, our duty is to determine what forms of financial assistance a city may use under existing Washington law to encourage conservation. In order to reach a desired result the majority: (a) ignores controlling constitutional and statutory authority dealing specifically with conservation; (b) rejects basic rules of statutory construction; (c) distorts beyond all recognition the language of a statute enacted in 1890; (d) interprets words in that statute to mean something other

than what is commonly understood by those words; and (e) disregards recent case law. Therefore, I dissent.

Const. art. 8, § 10 and RCW 35.92.360

Determining the propriety of Tacoma's conservation program requires an analysis of Const. art. 8, § 10 and RCW 35.92.360. Const. art. 8, § 7 prohibits gifts or loans of public money, except for the necessary support of the poor or infirm. In 1979, the voters passed an amendment which created an exception to the loan portion of the prohibition. *See* Const. art. 8, § 10 (amend. 70). The exception created by Const. art. 8, § 10 is limited; it allows municipal utilities to offer *loan* programs to nonpoor, noninfirm residential customers to assist in the purchase of conservation measures. In each case the utility must take a lien on the benefited residential structure. RCW 35.92.360 is the enabling legislation which implements Const. art. 8, § 10 (amend. 70).

Tacoma's conservation program is inconsistent with Const. art. 8, § 10 (amend. 70) and RCW 35.92.360 in several respects. First, participating customers are neither obligated to repay any of the funds received nor is a lien placed on any benefited structure. Second, the program extends to commercial as well as residential customers. Tacoma argues that its conservation program does not involve grants or loans, but rather authorizes the reacquisition of electricity from one ratepayer to be offered for resale to another. Thus, Tacoma argues that the restrictions imposed by RCW 35.92.360 are inapplicable. I disagree.

Where the language of the constitution is clear, the words used therein should be given their plain meaning. *State ex rel. O'Connell v. PUD 1,* 79 Wn.2d 237, 240–41, 484 P.2d 393 (1971); *State ex rel. State Capitol Comm'n v. Lister,* 91 Wash. 9, 156 P. 858 (1916). Const. art. 8, § 7 in express terms prohibits municipal corporations from giving or loaning money to any individual, except for the necessary support of the poor and the infirm. Our constitution directly and unequivocally prohibits all gifts and loans of money in

aid of individuals, subject to limited exceptions. *See State ex rel. O'Connell v. Port of Seattle*, 65 Wn.2d 801, 805, 399 P.2d 623 (1965).

One exception, Const. art. 8, § 10 (amend. 70) along with RCW 35.92.360, authorizes municipal utilities to provide financial assistance for conservation programs. RCW 35.92-.360 sets forth explicit preconditions before a municipal utility may commence a conservation financial assistance program. If the preconditions are met, then the financial assistance program is further limited by five specific requirements, such as the payback requirement. *See* RCW 35.92.360(1)–(5). A significant purpose of RCW 35.92.360 is to insure that municipal utilities will establish well conceived and cost–effective conservation programs. The Legislature has prohibited municipal utilities from providing financial assistance for conservation measures which are not cost effective.

I find it inconceivable that the Legislature intended to condition carefully and limit a municipal corporation's authority to make conservation assistance loans but did not intend to place any conditions on its authority to make conservation assistance grants. A fundamental rule of statutory construction is that the express mention of one thing implies the exclusion of the other. *Hi–Starr, Inc. v. Liquor Control Bd.*, 106 Wn.2d 455, 462, 722 P.2d 808 (1986). Here, the enactment of a financial conservation assistance scheme complete on its face, with specific monetary safeguards, denies cities and towns the authority to embark on conservation programs which are inconsistent with RCW 35.92.360.

The Tacoma conservation program does not contain the preconditions and safeguards required by RCW 35.92.360. I cannot agree with the majority that these preconditions and safeguards are not necessary due to the influence of market forces. Such market protection is illusory because the Tacoma conservation program involves direct grants to participating customers. The residential or commercial customer receives conservation measures but gives up nothing.

Once the money is invested by the municipal utility it is spent whatever the results. Only *if* sufficient energy is conserved can Tacoma City Light recoup on its investment. After receiving the conservation measures, the participating customer may double or triple energy consumption. Therefore, there is *no* guaranty of energy savings. Consequently, the market protection relied upon by the majority is no protection at all.

These concerns demonstrate the wisdom of the Legislature in enacting the comprehensive scheme detailed in RCW 35.92.360. The comprehensiveness of RCW 35.92.360 indicates that the Legislature intended to impose sufficient requirements to help insure cost effectiveness as a *prerequisite* of any conservation program. The majority argues that the protections of RCW 35.92.360 are not necessary because *"unless demonstrated as cost effective,* Tacoma's direct purchase program would run afoul of the article 8, section 7 gift prohibition." (Italics mine.) Majority opinion, at 690. I reject the majority's inference that the constitutionality of Tacoma's conservation program can only be decided by an after–the–fact assessment of cost effectiveness. Accordingly, I believe that the Legislature intended RCW 35.92.360 to be the exclusive authority for conservation loans and intended to prohibit conservation grants. As such, I would hold that Tacoma's conservation program is not statutorily authorized.

The majority places great emphasis on the "[e]xcept where otherwise authorized" language found in RCW 35.92.360 (majority opinion, at 690) interpreting this language to indicate that other statutes, such as RCW 35.92-.050, may authorize conservation programs. However, from this language it does not logically follow that the Legislature intended RCW 35.92.050 to authorize conservation programs. In fact, the consensus at the time RCW 35.92.360 was passed was that existing constitutional and statutory authority, *including RCW 35.92.050,* did not authorize *any* conservation program. This is demonstrated by the legislative history of RCW 35.92.360.

In 1979, the Legislature passed Substitute Senate Joint Resolution (SSJR) 120 and Substitute Senate Bill (SSB) 2976 (now Const. art. 8, § 10 (amend. 70) and RCW 35.92-.360). The 1979 Legislative Report, published by the Legislature, contained the following:

Substitute Senate Joint Resolution (SSJR) 120 is a proposed amendment to the Washington State Constitution which . . . would allow various governmental entities to use public moneys or credit, as authorized by the Legislature, to finance energy conservation programs. *Existing constitutional language does not allow the use of public moneys or credit for such programs,* and it is suggested that this impedes the efforts of public utilities to broaden energy conservation and energy efficiency programs.

(Italics mine.) *Final Legislative Report 1979,* at 178–79.

Prior to the passage of SSJR 120 the Attorney General opined that loaning public money to utility customers to enable them to acquire and install conservation materials would be unconstitutional. *See* AGLO 4 (1979). The Attorney General's letter opinion stated that he did not believe a potential public benefit would make an unconstitutional loan acceptable. AGLO 4 (1979), at 4.

SSJR 120 was submitted to the voters on November 6, 1979. The official ballot titled stated: "Shall municipal utilities be permitted by the constitution to assist owners of residences in financing energy conservation measures until 1990?" Voters Pamphlet 16 (1979). The voters pamphlet represented:

The law as it now exists:
Under the state constitution, municipal corporations such as counties, cities, and public utility districts cannot give or lend, or be authorized by the state legislature to give or lend, any of their funds or credit to assist private homeowners . . . in financing purchases or services, such as home insulation.

Voters Pamphlet, at 16. The voters ratified SSJR 120. Const. art. 8, § 10 (amend. 70) and its corresponding enabling legislation, RCW 35.92.360, became law.

This history supports the conclusion that RCW 35.92.360

is the exclusive method by which a municipal utility may implement a conservation financial assistance program. I recognize that legislative and Attorney General opinions are not definitive on the issue; nevertheless, they do support my conclusion that RCW 35.92.360 is the exclusive authority for conservation loans, and conservation grants are prohibited.

The majority asserts that Tacoma's conservation program does not purport to offer financing. Majority opinion, at 691. However, that is what Tacoma's program does—the participating consumer receives conservation measures at the municipal utility's expense. The majority fails to see the similarities between the use of public funds to purchase conservation and a grant or loan of public funds made pursuant to an authorized conservation financial assistance program. Merely labeling Tacoma's program as something other than a conservation financial assistance program does not alter the fact that the Legislature intended RCW 35.92.360 to preclude inconsistent conservation schemes.

## RCW 35.92.050

Because RCW 35.92.360 precludes Tacoma's conservation program, I do not believe it can be resurrected by reliance on RCW 35.92.050, a general electricity statute. Nonetheless, I will address the majority's argument that RCW 35.92.050 authorizes Tacoma's program.

A city's authority to enact a conservation financial assistance program must be found either in an express grant or by necessary implication from such a grant. *See Spokane v. J–R Distribs., Inc.*, 90 Wn.2d 722, 726, 585 P.2d 784 (1978); 2 E. McQuillin, *Municipal Corporations* § 10.09 (3d ed. 1979). A municipal corporation

> is limited in its powers to those necessarily or fairly implied in or incident to the powers expressly granted, and also those essential to the declared objects and purposes of the corporation. . . . *If there is a doubt as to whether the power is granted, it must be denied.*

(Citations omitted. Italics mine.) *Port of Seattle v. State*

*Utils. & Transp. Comm'n,* 92 Wn.2d 789, 794–95, 597 P.2d 383 (1979); *accord, Chemical Bank v. WPPSS,* 99 Wn.2d 772, 792, 666 P.2d 329 (1983). The majority must ignore controlling constitutional, statutory, and recent common law authority, as well as the above quoted language, to hold that Tacoma's conservation program is authorized by RCW 35.92.050.

RCW 35.92.050 provides:

> A city or town may also construct, condemn and purchase, purchase, acquire, add to, alter, maintain and operate works, plants, facilities for the purpose of furnishing the city or town and its inhabitants, and any other persons, with gas, electricity, and other means of power and facilities for lighting, heating, fuel, and power purposes, public and private, with full authority to regulate and control the use, distribution, and price thereof, together with the right to handle and sell or lease, any meters, lamps, motors, transformers, and equipment or accessories of any kind, necessary and convenient for the use, distribution, and sale thereof; authorize the construction of such plant or plants by others for the same purpose, and purchase gas, electricity, or power from either within or without the city or town for its own use and for the purpose of selling to its inhabitants and to other persons doing business within the city or town and regulate and control the use and price thereof.

This statute, originally passed in 1890, is general enabling legislation authorizing a city or town to operate a municipal electric utility. It authorizes the purchase or acquisition of electric generating facilities. It also authorizes the purchase of electricity for a city's use and for resale to other customers. RCW 35.92.050 does not authorize Tacoma's conservation program.

Unambiguous words within a statute which are not defined therein should be given their ordinary meaning. *King Cy. Coun. v. Public Disclosure Comm'n,* 93 Wn.2d 559, 561, 611 P.2d 1227 (1980). I protest the majority's selective rejection of rules of statutory construction which have been developed to aid courts in ascertaining legislative intent. Majority opinion, at 693. However, I realize that the

majority must reject these rules to reach the result it desires.

We recently construed RCW 35.92.050 in *Chemical Bank v. WPPSS*, 99 Wn.2d 772, 666 P.2d 329 (1983). I do not find the majority's distinction between *Chemical Bank* and this case to be particularly compelling. Here, Tacoma's conservation program will not necessarily result in reduced energy consumption. Thus, the Tacoma program suffers from deficiencies similar to the agreement in *Chemical Bank* to purchase electricity which may never exist. In *Chemical Bank* we used an ordinary commonsense reading of the term "electricity". We held that an agreement to purchase project capability did not qualify as the purchase of electricity. *Chemical Bank,* at 784. Likewise, in the present case, I would find that the purchase of "electricity" and the purchase of "electric generating facilities" as used in RCW 35.92.050 are clear and unambiguous. I would hold that the purchase of conservation does not qualify as the purchase of electricity or as the purchase of an electric generating facility.

I realize that some electrical utility professionals view conservation as the "functional equivalent" of purchasing electricity. But this view is by no means universal. For example, Donald Caha, power manager of Tacoma City Light, testified as follows:

> Q Now, I believe, Mr. Caha, that you testified that you are responsible for purchasing power for the Tacoma Light Division? A Yes, sir. Q And I take it your Department also constructs or acquires electrical generation facilities? A Yes, that is correct. *Q Now, conservation is not the purchase of electricity as you commonly use that term, is it, Mr. Caha? A Yes, that is correct. Q And conservation is not an electric generation facility as you commonly use that term? A That is true.*

(Italics mine.) Report of Proceedings vol. 2, at 41.

Undoubtedly, the Legislature was aware of the conflicting opinions of utility professionals when it passed the carefully detailed conservation program described in RCW 35.92.360. However, neither at that time nor at any subsequent time

has it authorized the purchase of functional equivalents of electricity. Moreover, if RCW 35.92.050 authorized a program like Tacoma's, RCW 35.92.360 would not have been necessary.

The court's role is to ascertain the intent of the Legislature. *Service Employees, Local 6 v. Superintendent of Pub. Instruction,* 104 Wn.2d 344, 348, 705 P.2d 776 (1985). The majority abdicates its responsibility of interpreting RCW 35.92.050 by its total reliance on the views of some utility professionals. The majority would have us rely on electric utility professionals and recent conservation statutes enacted elsewhere to turn the general RCW 35.92.050 into a conservation statute, despite legislative intent to the contrary. In my view, nothing in the legislative history or the plain language of RCW 35.92.050 suggests that the Legislature has ever intended to authorize a conservation grant program by enactment or amendment of RCW 35.92.050. To hold that it did requires a distorted reading of the language of RCW 35.92.050. Furthermore, under the majority's analysis almost any program whose intent is conservation and which remotely results in some savings of electricity would be authorized—surely the Legislature's grant of authority under RCW 35.92.050 is not that broad.

It is not the judiciary's role to expand the scope of statutory authority. *See Addison v. Holly Hill Fruit Prods., Inc.,* 322 U.S. 607, 617, 88 L. Ed. 1488, 64 S. Ct. 1215, 153 A.L.R. 1007 (1944). Never before have we stretched statutory interpretation to authorize the purchase of functional equivalents. Absent any indication that the Legislature intended otherwise, I would hold that RCW 35.92.050 does not authorize the purchase of functional equivalents. *See Port of Seattle,* at 794–95.

The majority's interpretation of RCW 35.92.050 also ignores other basic rules of statutory construction. In particular, it ignores the rule that a specific statute will control a statute of general application which seemingly conflicts. *Sim v. State Parks & Rec. Comm'n,* 90 Wn.2d 378, 382, 583 P.2d 1193 (1978). RCW 35.92.050 is a statute of general

authority. RCW 35.92.360 is a specific and comprehensive statute dealing with the financing of conservation programs. Accordingly, I would find that the specific statute, RCW 35.92.360, controls. Further, the majority ignores that in addition to being more specific, RCW 35.92.360 is more clearly worded than is RCW 35.92.050, and later in time. *See State ex rel. Graham v. San Juan Cy.,* 102 Wn.2d 311, 320, 686 P.2d 1073 (1984).

The majority's judicial transformation of RCW 35.92.050 into a statute which authorizes Tacoma's conservation program thwarts the process of responsible legislative deliberation and decisionmaking. Accordingly, I would hold that the Tacoma conservation program is beyond the authority granted by RCW 35.92.050; moreover, I would hold that it is precluded by RCW 35.92.360. I would affirm the trial court, but on statutory rather than constitutional grounds. *See Senear v. Daily Journal–American,* 97 Wn.2d 148, 152, 641 P.2d 1180 (1982).

DOLLIVER, ANDERSEN, and CALLOW, JJ., concur with GOODLOE, J.

Reconsideration denied November 6, 1987.