[No. 55104-3-I.   Division One.   December 19, 2005.]

RUD OKESON ET AL., *Individually and on Behalf of the Class of All Persons Similarly Situated, Respondents,* v. THE CITY OF SEATTLE, *Appellant.*

William H. Patton (of *Foster Pepper & Shefelman, P.L.L.C.*); and *Thomas A. Carr, City Attorney*, and *Rebecca C. Earnest, Assistant*, for appellant.

*David F. Jurca, Richard S. White*, and *Jennifer S. Divine* (of *Helsell Fetterman, L.L.P.*), for respondents.

*Laurie K. Beale* on behalf of Americans for the Arts, amicus curiae.

¶1 COLEMAN, J. — Seattle's Art in Public Works Construction ordinance, chapter 20.32 Seattle Municipal Code (SMC), requires City Light and other city departments to allocate 1 percent of the budgets for their capital construction projects within Seattle for the support of public art. From 2000 to 2003, the city of Seattle (City) spent almost $3 million of City Light moneys on projects as varied as Salmon in the City, Urban Collaborations, Skagit Streaming, and the Wave Rave Cave. Rud Okeson and other plaintiffs (hereinafter Okeson) challenged the funding of these projects and the application of the ordinance to City Light.

¶2 The trial court determined that many of these projects were for the benefit of the general public, not City Light or City Light ratepayers in particular, and should not have been funded with City Light revenue. The trial court

restricted the arts projects the City could support with City Light funds, ordered the transfer of funds from the City's General Fund to the City Light Fund, and invalidated the application of chapter 20.32 SMC to City Light. The City appeals.

¶3 We affirm in large part, with a modification of the court's decision to invalidate the application of chapter 20.32 SMC. City Light has the statutory authority to engage only in activities that have a sufficiently close nexus to the purpose of providing electricity to local residents. We decline to award attorney fees and costs to Okeson.

## FACTS

¶4 Seattle's Art in Public Works Construction ordinance, chapter 20.32 SMC, apportions 1 percent of City appropriations for capital construction projects within Seattle, including construction projects by City Light, for the support of public art. The City adopted the Art in Public Works Construction program more than 30 years ago with the stated understanding that it "accepts a responsibility for expanding public experience with visual art. . . . " SMC 20.32.010. Under the Art in Public Works Construction ordinance, all requests for appropriations for construction projects must include a 1 percent allocation for deposit in the Municipal Arts Fund. From 2000 to 2003, Seattle's Office of Arts and Cultural Affairs (the parent organization of the Municipal Arts Fund) spent $2,823,770.50 of City Light funds for a wide variety of public art ventures. They included artwork incorporated into renovations at City Light facilities, the Wave Rave Cave sculpture, Skagit Streaming, and pieces of art acquired for the Portable Artworks collection. City Light worked with the Office of Arts and Cultural Affairs to choose art and art projects, and the Office of Arts and Cultural Affairs earmarked funds from City Light in the Municipal Arts Fund and accounted for those funds separately from funds contributed by other departments.

¶5 Okeson brought a lawsuit on behalf of a class composed of City Light ratepayers against the City.[1] The trial court ultimately found that "[m]uch of the approximately $2.8 million in City Light funds spent by the Office of Arts and Cultural Affairs from 2000 through 2003 was spent to benefit the general public, not City Light ratepayers." (Finding of Fact 50). The majority of City Light funds spent on art projects from 2000 through 2003 "were spent on art purchases or art projects with a general governmental purpose, rather than a legitimate utility purpose." (Finding of Fact 51.) Projects lacking a sufficient nexus to a utility purpose included, but were not limited to, the Wall of Death, Wave Rave Cave, McCaw Hall light installation, Ballard Gateway project, Galer Street Overpass project, Salmon in the City, all aspects of Skagit Streaming other than its website, Second Avenue Extension, and West Lake Union Pathway. (Finding of Fact 51.)[2]

¶6 The court also placed restrictions on the future use of City Light funds to support art projects.

City Light may permissibly purchase art or fund art projects to beautify its own offices and customer service facilities, but may not fund art that is displayed in other City offices or in permanent or traveling public exhibitions. City Light may not expend utility funds to purchase art or fund art projects that have the primary purpose of improving City Light's image in a particular neighborhood or community, or cultivating public

---

[1] The lawsuit addressed not only the application of chapter 20.32 SMC to City Light, but the funding of streetlights, legal expenses incurred by Seattle, and governmental expenses charged by Seattle to City Light. This appeal concerns only the application of chapter 20.32 SMC to City Light. Another aspect of Okeson's suit, the legality of a Seattle ordinance transferring responsibility for paying for streetlights from Seattle to City Light, was heard by our Supreme Court and decided in *Okeson v. City of Seattle*, 150 Wn.2d 540, 78 P.3d 1279 (2003).

[2] Only the following purchases and projects had a sufficient nexus to legitimate utility purposes: Portable Artworks that are in the City Light's permanent collection and are the physical assets of City Light; City Light Photographer-in-Residence (McCracken); City Light's North Service Center renovation; City Light's South Service Center renovation; Creston Nelson Substation renovation and artwork; Boundary Dam documentary film; Electric Gallery substation wall (because it provides a pleasant work area for City Light employees); Temple of Power gazebo at Newhalem Dam; Oculus Portals at Boundary Dam; Georgetown Steam Plant project; and the website aspect of Skagit Streaming.

relations. City Light may not spend utility funds for the purpose of mitigating a substation's appearance, when the primary purpose of the art is to provide artistic benefit to the surrounding neighborhood and the public as a whole. City Light may permissibly spend utility funds to educate the public about conservation, but the Office of Arts and Cultural Affairs may not use the conservation education rationale as justification for using City Light funds to support an art project merely because it mentions salmon, or contains illuminated artwork.

(Conclusion of Law 9.)

¶7 The court ordered the City to transfer from its General Fund to the City Light Fund all City Light funds contributed under chapter 20.32 SMC, except for moneys for maintaining City Light's portable artworks collections and permissible utility art projects. (Conclusion of Law 10.) The court also invalidated the application of chapter 20.32 SMC to City Light. It allowed City Light itself to fund art and art projects "as long as proprietary utility funds are spent only on art or art projects with a close nexus to the utility's primary purpose of furnishing electricity to ratepayers." (Conclusion of Law 11.)

¶8 The court entered judgment pursuant to CR 54(b) and decreed that chapter 20.32 SMC was declared invalid as applied to City Light, that the City was prohibited from enforcing chapter 20.32 SMC with respect to City Light, and that City Light was not prohibited from purchasing art or funding art projects so long as proprietary utility funds were spent only on projects with a close nexus to the utility's primary purpose of furnishing electricity to its ratepayers. The City appeals.

## ANALYSIS

¶9 We begin by analyzing the City's claim that the trial court erred in requiring art projects funded with City Light moneys to have a "sufficiently close nexus" to the utility's primary purpose of furnishing electricity to ratepayers. An appellate court reviews conclusions of law

de novo. *Perry v. Costco Wholesale, Inc.*, 123 Wn. App. 783, 792, 98 P.3d 1264 (2004).

¶10 Municipalities "possess only those powers conferred on them by the constitution, statutes, and their charters," as well as powers " 'necessarily or fairly implied in or incident to the powers expressly granted, and also those essential to the declared objects and purposes of the corporation.' " *City of Tacoma v. Taxpayers of Tacoma*, 108 Wn.2d 679, 685-86, 692, 743 P.2d 793 (1987) (quoting *Port of Seattle v. State Utils. & Transp. Comm'n*, 92 Wn.2d 789, 794-95, 597 P.2d 383 (1979)); *see also* 2A EUGENE MCQUILLIN, MUNICIPAL CORPORATIONS § 10.09 (3d ed. 1996). RCW 35.92.050 confers upon municipalities the authority to construct and operate "works, plants, facilities for the purpose of furnishing the city or town and its inhabitants, and any other persons, with gas, electricity, and other means of power and facilities for lighting . . . ." A municipality's actions taken under RCW 35.92.050 "serve a business, proprietary function, rather than a governmental function." *Taxpayers*, 108 Wn.2d at 694. "[W]hen the Legislature authorizes a municipality to engage in a business, '[it] may exercise its business powers very much in the same way as a private individual.' " *Taxpayers*, 108 Wn.2d at 694 (second alteration in original) (quoting *Public Util. Dist. No. 1 of Pend Oreille County v. Town of Newport*, 38 Wn.2d 221, 227, 228 P.2d 766 (1951)). Courts have viewed the legislature's enactment of RCW 35.92.050 "as implicitly authorizing a municipality to make all contracts, and to engage in any undertaking necessary to make its municipal electric utility system efficient and beneficial to the public." *Taxpayers*, 108 Wn.2d at 694-95.

¶11 The City contends that under *Taxpayers*, it may use City Light funds to support art projects as an exercise of its proprietary powers and that a court may prohibit this exercise of proprietary power only if it is arbitrary, capri-

cious, or unreasonable.[3] The City also argues that the trial court failed to show the proper deference due to a first class charter city in carrying out its broad legislative powers. Under article XI, section 10 of the state constitution, first class cities may adopt city charters, which allow cities to exercise broad legislative powers. *Heinsma v. City of Vancouver*, 144 Wn.2d 556, 566, 29 P.3d 709 (2001).

■ ■ ¶12 We are not persuaded by the City's arguments. A city's municipal utility authority "has limits." *Taxpayers*, 108 Wn.2d at 695. "In exercising its proprietary power, [a municipality] may not act beyond the purposes of the statutory grant of power . . . ." *Taxpayers*, 108 Wn.2d at 695. A utility activity is within the purposes of RCW 35-.92.050 only if it bears "a sufficiently close nexus to the purpose and object the Legislature intended to serve in granting the power to operate an electric utility," which is the supply of electricity to the municipality and its inhabitants. *Taxpayers*, 108 Wn.2d at 696. In *Taxpayers*, our Supreme Court ruled that a Tacoma conservation program freed up electricity supplies and therefore bore a sufficiently close nexus with the legislative purpose of RCW 35-.92.050. *Taxpayers*, 108 Wn.2d at 696. Although conservation did not come within the ordinary meaning of the language of RCW 35.92.050, the sufficiently close nexus of conservation to the supply of electrical power brought the program within the legislature's grant of authority in RCW 35.92.050.

■ ■ ¶13 Under the analysis in *Taxpayers*, the trial court in this dispute correctly required City Light-funded art projects to bear a sufficiently close nexus to the purpose and object of supplying electricity to Seattle and its inhabitants. Art and art projects that satisfy the requirement of a sufficiently close nexus to the purpose of supplying electricity may be construed as a function of the City's

---

[3] The City also argues that the proper standard was articulated in a 1985 letter from an assistant attorney general to the City stating that the City could use utility funds to support the arts "[s]o long as there is *a discernible nexus* between the use of utility funds and the purposes for which the utility exists." Ex. 274, at 2 (emphasis added).

proprietary power of operating an electrical utility. Art and art projects that do not have a sufficiently close nexus are an exercise of the City's general governmental power and are outside the legislature's grant of authority in RCW 35.92.050. The City cannot spend City Light funds to support the latter.[4]

¶14 We next examine the City's challenge to the trial court's limitations on the use of City Light funds for art and art projects. The City argues that the limitations are too restrictive. We disagree with this argument as well. In *Okeson v. City of Seattle*, 150 Wn.2d 540, 78 P.3d 1279 (2003), our Supreme Court delineated the proper test for distinguishing between proprietary functions and governmental functions. "The principal test in distinguishing governmental functions from proprietary functions is whether the act performed is for the common good of all, or whether it is for the special benefit or profit of the corporate entity." *Okeson*, 150 Wn.2d at 550. Under this test, the City exercised its proprietary authority under RCW 35.92.050 when it used City Light funds for the benefit of City Light and improperly exercised its governmental authority when it used City Light funds to create art for the common good of all.

¶15 For this reason, the trial court properly allowed the City to use City Light funds for such projects as the renovation of City Light facilities and the acquisition of artwork for display in City Light offices. Such projects beautify employee workspaces and customer service areas

---

[4] Okeson makes two alternative arguments for affirming the limitations on City Light-funded art and art projects. Okeson first contends that the City's use of City Light funds for art projects violated Washington's local government accounting statute, RCW 43.09.210. This statute prohibits one government entity from receiving services from another government entity for free or at reduced cost absent a specific statutory exemption. *State v. Grays Harbor County*, 98 Wn.2d 606, 610, 656 P.2d 1084 (1983). While we decline to rule on this issue, we note that the City earmarked City Light funds in the Municipal Arts Fund and accounted for those funds separately from other funds. Okeson also asks this court to consider its argument that City Light moneys used by the City for general governmental purposes constituted a tax that placed the City's already existing tax on City Light above a statutory maximum. Because we affirm on grounds articulated by the trial court, we do not need to reach this issue.

and thereby help increase the efficiency of workplace operations and act to the benefit of City Light. The trial court correctly prohibited the City from using City Light moneys to fund art for display in permanent or traveling public exhibitions or for the offices of other City departments, despite the occasional presence of City Light personnel in those offices. Such projects provide a general benefit to the public at large, not City Light.

¶16 Similarly, the trial court properly barred the use of City Light funds to support art projects for mitigation "when the primary purpose of the art is to provide artistic benefit to the surrounding neighborhood and the public as a whole." The trial court also correctly allowed the City to use City Light funds for art projects that furthered conservation education. As the *Taxpayers* court stated, conservation furthers the ability of a utility to supply electricity to the municipality and its residents. But the trial court correctly prohibited the City from relying on conservation education as a pretext for art projects whose purpose was to benefit the general public.

¶17 The City further argues that the trial court erroneously restricted the use of City Light funds for art projects that function as advertising or public relations.[5] RCW 80.28.010, however, limits the charges imposed by electrical utilities on their ratepayers to amounts that are "just, fair, reasonable and sufficient." RCW 80.28.010(1). This statute also requires electric utilities to "furnish and supply such service, instrumentalities and facilities as shall be safe, adequate and efficient, and in all respects just and reasonable." RCW 80.28.010(2). Nothing in this statutory scheme directs City Light to promote itself as a good neighbor or allows the City to pass public relations expenditures on to City Light ratepayers. *See Jewell v. Wash. Utils. & Transp.*

[5] The City also argues that the trial court erroneously failed to rule on the issue of advertising. We disagree. While the trial court did not specifically allow or disallow the use of City Light funds for advertising, its factual findings and conclusions of law make clear that City Light may fund an art project, including an advertising project, as long as it has a sufficiently close nexus to the purpose of supplying electricity.

*Comm'n*, 90 Wn.2d 775, 777, 585 P.2d 1167 (1978).[6] The trial court correctly limited the use of City Light funds by the City for advertising and public relations.

¶18 We next analyze the City's contention that the trial court erred in ruling that particular art projects lacked the necessary nexus to the purpose of providing electricity. When a trial court has weighed evidence, appellate review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether the findings support the conclusions of law. *Perry*, 123 Wn. App. at 792. Substantial evidence is "evidence sufficient to persuade a fair-minded person of the truth of the asserted premise." *Perry*, 123 Wn. App. at 792. A trial court's findings of fact are " 'entitled to the benefit of all evidence and reasonable inference therefrom.' " *Perry*, 123 Wn. App. at 792 (quoting *Mason v. Mortgage Am., Inc.*, 114 Wn.2d 842, 853, 792 P.2d 142 (1990)). The City first argues that the trial court heard uncontroverted evidence that the invalidated projects employed public relations methods and advertising to promote conservation and other utility matters. We find the City's argument unpersuasive.

¶19 The City's evidence consists only of broad, general statements about the applicability of the disputed projects to the goals of conservation and education without any explanation as to how the projects furthered these goals. Substantial evidence supports the trial court's finding that the disputed projects, such as the non-Web portions of Skagit Streaming,[7] functioned as public art and not as educational projects promoting conservation. As for the

---

[6] We also note that the Washington Administrative Code prohibits utilities from requiring ratepayers to bear expenses for promotional advertising, including advertising "to influence consumers' opinions of the electric utility." WAC 480--100-223(1). The Code allows only a few exceptions, including an exception for advertising "which informs customers how to conserve energy or reduce peak demand for energy" or "which promotes the use of energy efficient appliances, equipment, or services." WAC 480-100-223(2)(a), (e).

[7] The Skagit Streaming project funded the transmission of above-water and below-water imagery of the Skagit River via fiber optic cable from two cameras at the river to Seattle. (A third camera provided footage of microscopic life from Skagit River water.) The footage was shown on a monitor at the lobby of the Municipal Building, and a large projection screen on the west side of the

promotion of community relations, WAC 480-100-223 prohibits the use of ratepayer moneys to promote the utility's good image in the community.

¶20 The City also argues that many of the invalidated projects occurred in City offices and other places where City Light did business and therefore satisfied the necessary nexus. But the trial court correctly ruled that the placement of City Light-funded art in the offices of other City departments lacked the necessary nexus. Furthermore, the trial court in its role as fact-finder had sufficient evidence to decide that projects such as Urban Collaborations functioned as public art, despite their proximity to City Light wires or structures.[8] The City additionally argues that invalidated projects such as the Ballard Gateway Project and the Wave Rave Cave mitigated the presence of nearby poles, wires, and facilities and therefore had a nexus with the purpose of providing electricity.[9] Here, too, the record

downtown Bon Marché (now Macy's) parking garage. Barbara Goldstein, director of the Public Art Program for the Office of Arts and Cultural Affairs, testified that the monitor in the Municipal Building displayed the footage "so that people that—like City Council people [who] are making decisions about the environment and about electricity could see it every day as they went in and out of the building." Trial Proceedings (TP) (Apr. 19, 2004) at 77:11-15. But unlike the Web page for the Skagit Streaming project, the Municipal Building and Bon Marché displays did not feature information explaining any relationship between electricity and the environment. Substantial evidence supported the trial court's finding that these projects were for the benefit of the general public—not City Light ratepayers.

[8] Under the Urban Collaborations program, the Seattle Arts Commission (the predecessor of the Office of Arts and Cultural Affairs) commissioned a Seattle artist to develop "small monuments" for the Cascade and South Lake Union neighborhoods. Excerpts of Trial Proceedings (ETP) (Apr. 15, 2004) at 110:24. The "small monuments" are two-dimensional tile pieces embedded in the sidewalk throughout South Lake Union and Cascade. The tile pieces depict the history and changing nature of the neighborhood. Goldstein testified that they were not connected to hatch covers or City Light facilities, but that "most of them" were underneath City Light wires. ETP (Apr. 15, 2004) at 111:12. Because these tile pieces have only a tenuous connection with City Light, the trial court's conclusion that they were not placed where City Light "does business" and instead functioned as public art is supported by the record.

[9] The Wave Rave Cave is a sculpture under an entrance to Route 99. It consists of concrete-and-pea-gravel waves that erupt from a sculpted sea of pea gravel. At night, moving psychedelic lights create a sense of motion in the sculpture. Goldstein testified that the sculpture is located next to a lot in Belltown that was purchased by City Light for use as a substation. Because Belltown residents were

supports the trial court's decision as the fact-finder that such projects instead constituted art for the benefit of the general public.

¶21 We next consider the City's argument that the trial court erred in invalidating the application of chapter 20.32 SMC to City Light. Municipal ordinances are presumed to be valid. *Heinsma*, 144 Wn.2d at 561. The City does have the authority under RCW 35.92.050 to use City Light funds to support art projects, as long as the projects bear a sufficiently close nexus to the purpose of supplying electricity. While the City administered the ordinance to City Light in the past in disregard of the nexus requirement, this error does not require the invalidation of the ordinance. The trial court's requirement of a sufficiently close nexus and its restrictions on the use of City Light funds sufficiently protects City Light ratepayers. The transfer of decision-making authority from the City to City Light would provide little additional protection, as the utility is part of the City and its capital improvements budget is under the control of the city government.[10] We therefore modify the trial court's judgment to permit the continued application of chapter 20.32 SMC to City Light.[11]

---

concerned with the dark space immediately nearby under the freeway, Goldstein stated, a City Light artist-in-residence proposed a sculpture that lit up at night "so that it made the place a little bit less scary, and it also . . . made that whole area, which is really impacted by City Light having left the lot vacant and now having a temporary work site, creating something that would be a little bit more pleasant there." TP (Apr. 19, 2004) at 70:17-21.

[10] We also note that chapter 20.32 SMC requires the Office of Arts and Cultural Affairs to "[p]romulgate rules and regulations" consistent with chapter 20.32 SMC "to facilitate the implementation of its responsibilities under this chapter." SMC 20.32.040(D). The Office of Arts and Cultural Affairs will have the opportunity to promulgate rules incorporating the nexus requirement.

[11] The City argues on appeal that the trial court's order to transfer funds from the General Fund to the City Light Fund was unreasonable because the record does not show that the City knowingly violated the limits of its authority or that the cost of art funded with City Light moneys should be considered a tax refundable by the City. The record demonstrates, however, that the City spent City Light moneys on a large number of projects without regard to the nexus requirement. The court was therefore justified in ordering the return to the City Light Fund of moneys spent on projects that did not have a sufficiently close nexus to the purpose of supplying electricity.

¶22 Okeson asks for attorney fees on appeal. Because the trial court awarded attorney fees on a "percentage of recovery" basis, the request is denied.[12] "A 'percentage of recovery' approach sets attorney fees by calculating the total recovery secured by the attorneys and awarding them a reasonable percentage of that recovery . . . ." *Bowles v. Dep't of Ret. Sys.*, 121 Wn.2d 52, 72, 847 P.2d 440 (1993). "While the lodestar method is generally preferred when calculating *statutory* attorney fees, the percentage of recovery approach is used in calculating fees under the common fund doctrine." *Bowles*, 121 Wn.2d at 72. "In common fund cases, the size of the recovery constitutes a suitable measure of the attorneys' performance." *Bowles*, 121 Wn.2d at 72. In *Bowles*, the plaintiffs requested attorney fees for their work on the appeal. *Bowles*, 121 Wn.2d at 75. The *Bowles* court declined. *Bowles*, 121 Wn.2d at 75. "Under the percentage of recovery approach, the attorneys are to be compensated according to the size of the judgment recovered, not the actual hours expended. The plaintiffs have not increased the size of their recovery on appeal, thus we have no basis to increase their fees." *Bowles*, 121 Wn.2d at 75. *Bowles* indicates that this court should decline to award attorney fees and expenses on appeal to Okeson as well, as Okeson has not increased the size of recovery on appeal.

AGID and SCHINDLER, JJ., concur.

---

[12] Okeson contends that the court's order does not make clear whether the court calculated attorney fees with the "percentage of recovery" approach or the lodestar approach. While the court's order refers to the lodestar approach, it states, "*Under a percentage of recovery theory*, plaintiffs' counsel is awarded from the common fund $3.5 million in fees together with $152,246 in costs incurred." Reply Br. of Appellant, App. A, at 3 (emphasis added).