[No. 77888-4.   En Banc.]
Argued May 23, 2006.     Decided January 18, 2007.

RUD OKESON ET AL., *Individually and on Behalf of the Class of All Persons Similarly Situated, Appellants*, v. THE CITY OF SEATTLE, *Respondent.*

*David F. Jurca, Richard S. White*, and *Connie K. Haslam* (of *Helsell Fetterman, LLP*), for appellants.

*William H. Patton* (of *Foster Pepper, PLLC*) and *Thomas A. Carr, City Attorney*, and *Suzanne L. Smith, Assistant*, for respondent.

*Michael J. Robinson-Dorn* and *Elizabeth Thomas* on behalf of Climate Solutions, Global Warming Action, National Resources Defense Council, Northwest Energy Coalition, and Washington Environmental Council, amici curiae.

*Douglas J. Shaeffer* on behalf of Fred Hutchinson Cancer Research Center, amicus curiae.

*Norm Maleng, Prosecuting Attorney*, and *Peter G. Ramels* and *Donald C. Woodworth, Deputies*, on behalf of King County, amicus curiae.

---

¶1 ALEXANDER, C.J. — In this class action on behalf of Seattle City Light ratepayers, we are asked to decide whether a municipal utility may mitigate the effects of its greenhouse gas emissions by paying public and private entities to reduce those entities' emissions. We hold that combating global warming is a general government purpose, albeit a meritorious one, and not a proprietary utility purpose. Therefore, such mitigation expenses must be borne by general taxpayers rather than utility ratepayers. Accordingly, we reverse the trial court's order granting summary judgment to Seattle.

I

¶2 Seattle City Light (City Light) is an electric utility owned and operated by the city of Seattle. On April 10, 2000, the Seattle City Council adopted Resolution 30144 in honor of the 30th anniversary of Earth Day. The resolution proclaimed in relevant part:

> The City of Seattle supports the Earth Day 2000 initiative to focus attention on one of the world's most urgent environmental challenges: reducing greenhouse gases to help mitigate global warming . . . . The City of Seattle will reduce greenhouse gas emissions in its own operations and through community actions by:
>
> 1. Establishing a long-range goal of meeting the electric energy needs of Seattle with no net greenhouse gas emissions . . . .

Immediately, City Light will meet growing demand with no net increase in greenhouse gas emissions by:

. . . .

. . . Mitigating or offsetting greenhouse gas emissions associated with any fossil fuels used to meet load growth.

Clerk's Papers (CP) at 530.

¶3 Also in 2000, the city of Seattle negotiated to buy power from a gas-fired cogeneration plant owned by the city of Klamath Falls, Oregon. The city of Seattle estimated that its purchase of Klamath Falls power would be associated with up to 272,727 tons of carbon dioxide ($CO_2$) emissions per year. Accordingly, the Seattle City Council adopted Resolution 30256, which cited the "no net impact" policy and directed City Light to "fully mitigate or offset" the emissions associated with the Klamath Falls contract. CP at 551, 552.

¶4 The following spring, City Light hired Climate Trust of Portland, Oregon, to solicit and evaluate proposals for "offset acquisition." CP at 660. Then in another step in the "no net increase" plan, the council adopted Resolution 30359, which stated:

WHEREAS, global warming represents a clear and increasingly imminent danger to the economic and environmental health of the world, and to specific qualities of life for the Seattle area including water supply, hydroelectric energy production, air quality, forest health, species protection and recreational activities; and

WHEREAS, local action to reduce greenhouse gas [GHG] emissions is consistent with Seattle's environmental commitments and its other high priority policy objectives . . . ; and

WHEREAS, energy production and consumption accounts for the vast majority of human-caused GHG emissions, and Seattle has an extraordinary opportunity to control its own electric energy future by virtue of its ownership of Seattle City Light; and

. . . .

. . . City Light, in consultation with the Advisory Committee comprised of experts from academic institutions, state and

regional agencies, private business, City Light customers, and public interest organizations reached consensus on a method for calculating City Light's current and likely future GHG emissions and a process for mitigating those emissions; . . .

. . . .

. . . BE IT RESOLVED . . . THAT:

. . . .

. . . City Light will expeditiously execute commitments to mitigate for all of the GHG emissions attributable to it.

CP at 560-61.

¶5 Resolution 30359 estimated that greenhouse gas emissions associated with City Light's power purchases and internal operations would total 362,976 metric tons a year from 2003 through 2005.[1] The resolution stated that it is more expensive to reduce emissions locally than in other areas. The resolution directed City Light to "immediately pursue the possibility of" paying others to reduce their emissions in order to offset City Light's own contributions to global greenhouse gas. CP at 562. The resolution also directed City Light to give priority to local emission-reduction projects "as long as they allow the total average cost to remain within $5/ton and preserve[ ] enough funds to meet the full mitigation obligation for that year." CP at 563.

¶6 Pursuant to the 2000 and 2001 resolutions, City Light entered a series of agreements to pay other entities to use cleaner fuels and, in return, to receive credit for the resulting greenhouse gas reductions.[2] Most of these agree-

---

[1] City Light later estimated that its purchases and operations in 2003 actually contributed from 222,756 to 290,239 metric tons of $CO_2$ to the atmosphere.

[2] For example, in August 2003, City Light agreed to pay half of the cost of converting the 900 vehicles of the city of Seattle's Fleets and Facilities Department to 20 percent biodiesel fuel. In May 2004, City Light agreed to pay the Washington State Ferries up to $635,600 to start using 20 percent biodiesel fuel on its West Seattle-Vashon route. The agreement stated that biodiesel, made with alcohol and vegetable oils, is more expensive than petroleum fuel but "results in fewer GHG emissions." CP at 571. In September 2004, City Light agreed to pay King County up to $200,000 to use a mix of biodiesel and low-sulfur fuel in the county's Metro buses in 2004 and 2005. In May 2005, City Light agreed to pay Princess Cruise Lines up to $10,000 a year to use "Shore Power" (electricity provided by City Light) instead of diesel marine fuel while docked in Seattle on

ments were with local entities, such as King County Metro and the Washington State Ferries. An exception was a $650,000 contract with the DuPont Company to buy 300,000 tons of emission offsets from a DuPont plant in Kentucky. According to a City Light press release issued in November 2005, the contract made City Light "the first large electric utility in the country to effectively eliminate its contribution of harmful greenhouse gas emissions into the environment." Appellants' Br. at App. B-1.

¶7 While this greenhouse gas program was evolving, Rud Okeson, Doris Burns, Walter Williams, and Arthur Lane (the ratepayers) brought a series of claims against the city of Seattle, alleging various misuses of City Light funds. They filed the first of several complaints in King County Superior Court in February 2002, challenging a 1999 ordinance that shifted responsibility for lighting Seattle streets from the city's general taxpayers to City Light ratepayers. This court agreed with the ratepayers that the shift was unlawful. *See Okeson v. City of Seattle*, 150 Wn.2d 540, 78 P.3d 1279 (2003) (*Okeson* I). The ratepayers then filed an amended complaint in December 2003, adding certain other claims that City Light improperly spends ratepayer money on nonutility purposes. In the second phase of the case, the trial court concluded that City Light could buy art to beautify its own facilities but not to benefit the general public. The Court of Appeals affirmed that ruling in *Okeson v. City of Seattle*, 130 Wn. App. 814, 125 P.3d 172 (2005) (*Okeson* II).

¶8 The ratepayers first challenged the legality of City Light's greenhouse gas offset contracts in a second amended complaint filed in the fall of 2004. The ratepayers asked the trial court to: (1) prohibit City Light from spending any more funds on the biodiesel conversion programs, (2) order reimbursement of City Light for its funding of the programs, and (3) require refunds to ratepayers. On June 27, 2005, the city listed 21 possible witnesses related to the

cruise-season weekends. CP at 692. City Light reimbursed Seattle Public Utilities for paying its contracted garbage haulers to use biodiesel fuel.

greenhouse gas claims. About a month later, over the city's objections, the ratepayers filed a third amended complaint purporting to be based on events that happened after the second amended complaint was filed. The third amended complaint alleged that City Light was negotiating or considering new GHG mitigation contracts that would (1) constitute illegal gifts of public funds or, alternatively, unconstitutional taxes and (2) violate the local government accounting statute, RCW 43.09.210. In response to that broadening of claims, on August 26, 2005, Seattle disclosed additional possible witnesses. Both sides moved for summary judgment on the legality of the GHG offset contracts. On September 22, 2005, the ratepayers moved to strike declarations of six possible witnesses "because of Seattle's failure to make timely disclosure of those witnesses." CP at 1161.

¶9 On September 30, 2005, the trial court granted summary judgment to Seattle on the offset issue. In doing so, the trial court said:

> I think that City Light has the authority to reduce its own emissions. It can do that by managing its own facilities, its own producing facilities, or it can spend money to have its emissions, its contribution reduced by someone else. This all makes sense only because of the unusual nature of the greenhouse gas canopy; the fact that it is an envelope around the entire globe; that it's not localized.

Verbatim Report of Proceedings at 32-33. Nearly a month later, the trial court granted the ratepayers' motion to strike the Seattle witness declarations as untimely disclosed.

¶10 The ratepayers appealed the summary judgment order. Seattle cross-appealed the order striking witness declarations. We accepted direct review of both of the challenged orders. Amici curiae King County, Fred Hutchinson Cancer Research Center, and a coalition consisting of Climate Solutions, Global Warming Action, National Resources Defense Council, Northwest Energy Coalition, and Washington Environmental Council (environ-

mental groups) filed briefs supporting Seattle's greenhouse gas emissions program.

¶11 The appellant ratepayers submitted a brief conceding that City Light has statutory authority to reduce greenhouse gas emissions from its own facilities. The ratepayers contended, however, that paying to reduce emissions from other parties' facilities serves a general government purpose—improving the global environment—rather than a valid City Light purpose. They argued that the emission-reduction payments are illegal because they lack a sufficient nexus to the utility's statutorily prescribed purpose, which is to furnish people with electricity.

¶12 In response, Seattle argued that it has authority to choose the means of achieving its goal of causing no net increase in the world's greenhouse gas emissions. Seattle further argued that, in pursuit of that goal, it makes no difference whose greenhouse gas emissions are reduced because any reduction anywhere in the world has the same effect on global warming.

II

¶13 A trial court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions and affidavits on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). On appeal from a summary judgment order, "the appellate court engages in the same inquiry as the trial court." *Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co.*, 124 Wn.2d 618, 623-24, 881 P.2d 201 (1994) (citing *Our Lady of Lourdes Hosp. v. Franklin County*, 120 Wn.2d 439, 451, 842 P.2d 956 (1993)). The issues in this case pertain to the statutory authority of a municipal utility and therefore are issues of law to be determined de novo. *Okeson I*, 150 Wn.2d at 548-49.

III

■ ¶14 This court has been asked repeatedly over the last century to define the powers of public utilities. Our long-standing rule for determining the bounds of a utility's authority first appeared in *Farwell v. City of Seattle*, 43 Wash. 141, 86 P. 217 (1906), a case in which a Seattle resident sought to stop Seattle from supplying water to another city. We said in that case, "A municipal corporation is limited in its powers to those granted in express words, or to those necessarily or fairly implied in or incident to the powers expressly granted, and also to those essential to the declared objects and purposes of the corporation." *Id.* at 144 (citing 1 JOHN W. SMITH, COMMENTARIES ON THE MODERN LAW OF MUNICIPAL CORPORATIONS § 562 (1903); 1 JOHN F. DILLON, COMMENTARIES ON THE LAW OF MUNICIPAL CORPORATIONS § 89 (4th ed. 1890); *L.A. City Water Co. v. City of Los Angeles*, 88 F. 720 (S.D. Cal. 1898)); *accord City of Tacoma v. Taxpayers of City of Tacoma*, 108 Wn.2d 679, 692, 743 P.2d 793 (1987). Thus, in applying this rule, we must first determine whether the legislature expressly authorized city utilities to purchase greenhouse-gas offsets. If not, then we must examine whether authority for the City Light offset program is nevertheless "necessarily or fairly implied in or incident to" the express powers of city utilities. Finally, if authority for the greenhouse gas program is neither expressly granted nor fairly implied, we must determine if the program is permissible nonetheless as an activity "essential to" the declared objects and purposes of city utilities.

A. Express powers

¶15 City utilities derive their powers from RCW 35.92-.050. That enabling statute expressly authorizes cities to (1) operate works or plants for the purpose of furnishing persons with electricity or power-related facilities; (2) regulate and control the use, distribution, and price of the electricity or facilities furnished; (3) handle, sell, or lease equipment needed for the use, distribution, and sale of

electricity; and (4) buy power to resell to city residents and businesses. RCW 35.92.050.[3] The statute does not specifically authorize city utilities to pay other entities to reduce their greenhouse gas emissions. In fact, Seattle did not argue that its emission reduction program is expressly authorized. Accordingly, in the absence of such an express power, we must next analyze whether authority for the program is "necessarily or fairly implied in or incident to" the powers expressly granted by the legislature.

B. Implied and incidental powers

■ ¶16 Specifically, we must determine whether the legislature, in authorizing cities to "operate" facilities for the purpose of furnishing electricity and to "handle" any necessary equipment, impliedly authorized City Light to purchase greenhouse gas offsets. The test for determining the implied powers of cities was spelled out at length in *Taxpayers of Tacoma*, 108 Wn.2d at 693-95, as follows:

> Like other state supreme courts, we have historically taken different approaches to construing municipal powers according to whether the power exercised is governmental or proprietary in nature. When a governmental function is involved, less opportunity exists for invoking the doctrines of liberal construction and of implied powers. But when the Legislature authorizes a municipality to engage in a business, "[it] may exercise its business powers very much in the same way as a private individual . . ." [*Pub. Util. Dist. No. 1 of Pend Oreille County v. Town of Newport*, 38 Wn.2d 221, 227, 228 P.2d 766 (1951).] . . . Since 1910, we have broadly construed the means a municipality may use to conduct a statutorily authorized busi-

---

[3] "A city or town may . . . acquire, add to, alter, maintain and operate works, plants, facilities for the purpose of furnishing the city or town and its inhabitants, and any other persons, with . . . electricity, . . . and facilities for lighting, . . . heating, fuel, and power purposes, public and private, with full authority to regulate and control the use, distribution, and price thereof, together with the right to handle and sell or lease, any meters, lamps, motors, transformers, and equipment or accessories of any kind, necessary and convenient for the use, distribution, and sale thereof; . . . and purchase . . . power from either within or without the city or town for its own use and for the purpose of selling to its inhabitants and to other persons doing business within the city or town and regulate and control the use and price thereof." RCW 35.92.050.

ness. We have viewed the Legislature as implicitly authorizing a municipality to make all contracts, and to engage in any undertaking necessary to make its municipal electric utility system efficient and beneficial to the public.

. . . [M]unicipal utility authority has limits. In exercising its proprietary power, [a city] may not act beyond the purposes of the statutory grant of power, or contrary to express statutory or constitutional limitations. Thus, if municipal utility actions come within the purpose and object of the enabling statute and no express limitations apply, this court leaves the choice of means used in operating the utility to the discretion of municipal authorities. We limit judicial review of municipal utility choices to whether the particular contract or action was arbitrary or capricious, or unreasonable.

(First alteration in original) (footnotes omitted) (citations omitted).

■ ¶17 Thus, *Taxpayers of Tacoma* established that a city acts within its implied powers if all of the following conditions are met: (1) the city is exercising a proprietary power, (2) the action is within the purpose and object of the enabling statute, (3) the action is not contrary to express statutory or constitutional limitations, and (4) the action is not arbitrary, capricious, or unreasonable. *Id.* at 693-95, 700; *accord Hite v. Pub. Util. Dist. No. 2 of Grant County*, 112 Wn.2d 456, 463, 772 P.2d 481 (1989).

1. Proprietary or general?

■ ¶18 The ratepayers argued that City Light's GHG offset contracts serve a general government function, not a proprietary function, and therefore are not impliedly authorized by the utility's enabling statute, RCW 35.92.050. This court has said that "[t]he principal test in distinguishing governmental functions from proprietary functions is whether the act performed is for the common good of all, or whether it is for the special benefit or profit of the corporate entity." *Okeson* I, 150 Wn.2d at 550. Here, the ratepayers argue that City Light's offset contracts provide no "special benefit" to the utility.

Cleaning up the utility's own emissions is an inherent part of the utility's operations, and therefore serves a utility purpose, but cleaning up *other parties'* emissions in order to combat global warming for the betterment of everyone everywhere serves a general governmental purpose and is not for the special benefit of the utility or its ratepayers.

Reply Br. of Appellants at 2.

¶19 Seattle responded that "buying greenhouse gas offsets from a third party is the equivalent of reducing emissions from a utility's own operations." Br. of Resp't at 36. Seattle also noted that the offset contracts "secure the GHG offset credit only for Seattle City Light," suggesting that such credit is a special benefit for the utility. *Id.* at 39. The city also cited *Taxpayers of Tacoma* for the proposition that all utility operations are proprietary in nature. In that case, we said that "[a]ctions taken pursuant to RCW 35.92.050 serve a business, proprietary function, rather than a governmental function." *Taxpayers of Tacoma*, 108 Wn.2d at 694. Similarly, in *Hite*, 112 Wn.2d at 459, we said, "It is clear that in the production and sale of electricity, a municipal corporation acts in its proprietary capacity." *See also Okeson* I, 150 Wn.2d at 550 ("The electric utility operates for the benefit of its customers, not the general public.").

¶20 Distinguishing proprietary from government functions was a key issue in *Okeson* I, the first phase of this case. There, we held that providing streetlights is a general government function rather than a proprietary utility function because, unlike furnishing electricity, it is not for the " 'comfort and use' " of individual utility customers who can control their own usage but instead serves the "general public." *Okeson* I, 150 Wn.2d at 550 (quoting in part *Twitchell v. City of Spokane*, 55 Wash. 86, 89, 104 P. 150 (1909)). We reached that conclusion, although in 2002, before we issued the *Okeson* I decision, the legislature had amended RCW 35.92.050 to specifically authorize cities to operate streetlights " 'as part of their rate–based' " electric

utilities. *Id.* at 547 (quoting LAWS OF 2002, ch. 102, § 1).[4] Thus, in light of *Okeson* I, we cannot say today—as we did in *Taxpayers of Tacoma* in 1987—that *all* actions taken pursuant to RCW 35.92.050 are proprietary. Rather, an electric utility's action is proprietary only if: (a) it is part of the production and sale of electricity and (b) it is for the " 'comfort and use' " of individual customers paying only for their own usage, not for general public use. *Okeson* I, 150 Wn.2d at 550 (quoting *Twitchell*, 55 Wash. at 89).

■ ¶21 Applying the *Okeson* I standard to the current phase of the case, we conclude that City Light's GHG offset contracts are not proprietary because they are not part of the services for which individual customers are billed. Like the streetlights at issue in *Okeson* I, the offset contracts are charged to City Light customers regardless of how much electricity they use. In other words, there is no relationship between an individual's power use and what that individual pays through City Light rates for the GHG emission reduction program. While it is true that the program may be viewed as a legitimate part of the utility's production of electricity because its purpose is to prevent City Light's production from causing a net increase in global greenhouse gas emissions, that is not enough to make the program a proprietary function.

¶22 Under *Okeson* I, there must also be a connection between the amount paid and the benefit received by the ratepayer. The dissent contends that the requisite connection is met because City Light's ratepayers "benefit *specially* from knowing the electricity they consume is not contributing to anthropogenic climate change." Dissent at 456. We know of no authority for the proposition that a function performed by a public utility is to be viewed as a

---

[4] Although the 2002 amendment specifically authorized city utilities to charge their ratepayers for streetlights, we concluded that City Light could not do so because: (a) providing streetlights is a general government function, (b) streetlight-related charges constituted taxes rather than fees because they were designed to raise general revenue rather than to pay for specific customer services, (c) there must be express statutory or constitutional authority for a local government to impose a tax, and (d) the 2002 amendment did not include such taxing authority. *Okeson* I, 150 Wn.2d at 557-58.

proprietary function simply because some of the utility's ratepayers feel good about a particular function a utility is performing. We also disagree with the dissent's assertion that City Light's ratepayers benefit because "the offset program allows City Light to operate more efficiently" and "saves the ratepayers money." Dissent at 456, 457. While, as we have indicated, there may be legitimate reasons for a government agency to encourage a worldwide reduction in greenhouse gas emissions, it is a stretch to say that City Light's distribution of money to other entities that have reduced their emissions allows City Light to produce electricity more efficiently and provide that electricity to its customers at lower rates. The record simply does not support this assertion. In sum, the contracts are of a general government nature.

### 2. Statutory purpose?

■ ¶23 The next part of the test for determining a utility's implied powers is whether an action is "within the purpose and object of the enabling statute." *Taxpayers of Tacoma*, 108 Wn.2d at 695. A city program is impliedly authorized by RCW 35.92.050 if it "bears a sufficiently close nexus to the purpose and object the Legislature intended to serve in granting the power to operate an electric utility." *Id.* at 696. We have said that the primary purpose of RCW 35.92.050 is "supplying electricity to the municipal corporation and its inhabitants." *Id.* at 696. Thus, the question here is whether City Light's offset contracts bear a "sufficiently close nexus" to its statutory purpose: supplying electricity to its customers.

¶24 Here, the ratepayers argued that the required nexus is missing because global warming has only a slight and speculative impact, if any, on City Light's ability to supply electricity. They noted that the city is unable to quantify, for example, the extent to which GHG reductions at the DuPont plant in Kentucky help to preserve the Cascades snowpack, upon which the city relies for its hydropower. Seattle responded that it need not prove a "precise correla-

tion between saving one molecule of greenhouse gas and saving snowpack in the Cascades." Br. of Resp't at 38 n.12. Rather, the city argued that because reducing its own greenhouse gas emissions is a legitimate utility purpose, it necessarily has a close nexus to the utility's mission of furnishing electricity.

¶25 We agree with the city that its authority for the offset contracts does not hinge on proving that a specific emission reduction somewhere on the globe translates into more snowmelt flowing through the city's hydropower plants. It is not for us to evaluate the scientific merit of the city's offset contracts. Rather, the question is whether the offset contracts are closely related to the purpose of supplying electricity to City Light customers. Here, the decision in *Okeson* II, the second phase of this case, is instructive.

¶26 In that case, the Court of Appeals concluded that there was an insufficient nexus between City Light's statutory purpose and its funding of certain art projects. The court essentially conflated the first two parts of the test for determining a utility's implied powers, saying that a close nexus exists when a utility exercises its proprietary power and does not exist when a utility exercises its governmental power. The court held that City Light could buy art for its own facilities, and for conservation education, because such expenses supported City Light's efficiency and therefore benefited the utility itself rather than the general public. But the court also said City Light could not buy art for public exhibitions, other city offices, or mitigation projects because such expenses were primarily designed to benefit the public as a whole. In other words, a close nexus to supplying electricity exists when the action benefits the utility and its customers, but not when it benefits the general public.

¶27 We agree with the Court of Appeals that the nexus prong of the implied powers test largely mirrors the proprietary prong, in that both prongs focus on whether a utility action serves the general public or the individually billed

customer.[5] In this case, we have already concluded that the offset contracts do not serve the individually billed customer and therefore are not proprietary. Accordingly, we hold that the contracts also lack the required nexus to the purpose of supplying electricity because, although they are designed to clean up City Light's own emissions and therefore benefit the utility, they also are designed to benefit the public as a whole. This broader public purpose is evident in the city council resolution that directed the utility to execute the contracts. That resolution cited the threat that global warming poses to "the economic and environmental health of the world" as well as to "specific qualities of life for the Seattle area." CP at 560. In sum, the offset contracts are not within City Light's implied powers because they do not fall within the object and purpose of the utility enabling statute.

---

[5] There is one other published case in which the required nexus was found to be lacking. In *Kightlinger v. Pub. Util. Dist. No. 1 of Clark County*, 119 Wn. App. 501, 81 P.3d 876 (2003), taxpayers challenged a utility district's authority to run an appliance repair business. The Court of Appeals held that a utility activity bears the required close nexus to furnishing electricity only if that activity is "the same as" producing, selling, or distributing electricity. *Id.* at 511. Based on that rule, the court concluded that utility districts lack implied authority to repair appliances. While we pass no judgment here on whether appliance repairs are an authorized utility activity, we decline to embrace the reasoning of the *Kightlinger* decision because it appears to be based on a misreading of our decision in *Taxpayers of Tacoma*. In that case, we held that the city of Tacoma had implied authority to install conservation measures in private homes and businesses. *Taxpayers of Tacoma*, 108 Wn.2d at 696. We noted that "in the world of electric utility professionals an investment in conservation is considered the equivalent of purchasing electricity." *Id.* at 693. The *Kightlinger* court apparently relied on that language, saying the "[k]ey" to our decision "was the unchallenged factual finding that conserving electricity was essentially the same as producing new electricity." *Kightlinger*, 119 Wn. App. at 510. But that was not the only ground cited by this court in concluding in *Taxpayers of Tacoma* that a sufficiently close nexus existed between conserving electricity and generating or selling it. Rather, we were also concerned with whether Tacoma's activity served broader utility purposes of efficiency, pollution and cost control, and planning for future needs. Thus, *Taxpayers of Tacoma* did not establish a bright-line rule that a utility may engage only in activities that are the "same as" furnishing electricity. Rather, as noted above, *Taxpayers of Tacoma* stands for the proposition that a city utility's actions are impliedly authorized as long as they comport with a utility's statutory purpose of supplying electricity and are not arbitrary, capricious, unreasonable, in conflict with express limitations, or of a general governmental nature. In sum, because *Kightlinger* applied the wrong test, it is not instructive here.

## IV

¶28 Because we find that City Light's emissions offset contracts are neither proprietary nor within the utility's statutory purpose, we need not reach the remaining questions under the implied powers test.[6] Nor do we reach the question of whether declarations related to the ratepayers' offset claims were properly stricken. That is because the trial court stated that the declarations at issue in the motion to strike made no difference in deciding the legal issue underlying summary judgment.

¶29 In conclusion, City Light lacked authority to use ratepayer money for the offset contracts because they are neither proprietary in nature nor sufficiently related to the purpose of supplying electricity. Therefore, we reverse the trial court order granting summary judgment to the city and remand for entry of judgment consistent with this opinion.

C. JOHNSON, FAIRHURST, and J.M. JOHNSON, JJ., concur.

¶30 SANDERS, J. (concurring) — I concur in the majority's conclusion however object to its obiter dictum that the general governmental purpose of combating global warming, at least as it was done here, is "a meritorious one . . . ." Majority at 439.

¶31 On this record Seattle City Light's program of paying others not to emit greenhouse gases has about as much effect on global warming as making a bonfire out of ratepayers' hard-earned dollars. Let us consider the following:

> There are uncertainties about whether warming will really be bad (think longer growing seasons), but let's assume that cutting carbon dioxide emissions is a desirable goal.

---

[6] It should be noted that the ratepayers did not argue that the city acted arbitrarily and capriciously or unreasonably. In fact, the ratepayers "applaud" efforts to reduce City Light's own GHG emissions. Appellants' Br. at 27.

The nations that signed the Kyoto Protocols on global warming agreed to cut their emissions in the future. If each of them made the sacrifices of full compliance (the betting is that few will even come close), and those measures worked as expected, the world would end up only a tenth of a degree cooler.

And if that big an effort gets no results, state and local government policies can only be empty gestures. Economic activity will shift away from them toward other areas or nations—remember that China and India are exempt from the agreement.

Robert Michaels, Commentary, *Renewable Electricity "Creating" Jobs, Destroying Wealth*, ENV'T & CLIMATE NEWS, Dec. 2006, at 12.

J.M. JOHNSON, J., concurs with SANDERS, J.

¶32 OWENS, J. (dissenting) — The majority holds that Seattle City Light's (City Light) offset program serves a general government purpose (prevention of global warming) and not a proprietary utility purpose. I respectfully dissent. I would hold that City Light's greenhouse gas (GHG) offset program serves a proprietary function and provides special benefits to City Light and its ratepayers *in addition to* the common benefits that reductions in GHGs have for the general public. Accordingly, I would affirm the trial court.

¶33 City Light is a municipal corporation and possesses "only those powers conferred on [it] by the constitution, statutes, and [its] charter[ ]." *City of Tacoma v. Taxpayers of City of Tacoma*, 108 Wn.2d 679, 685-86, 743 P.2d 793 (1987) (citing 2 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 10.09 (3d ed. 1979)). Thus, City Light's authority to purchase offset credits "must derive from either an express grant or by necessary or fair implication from such a grant." *Id.* at 686. The statute giving City Light its authority does not expressly authorize City Light to purchase GHG offset credits. RCW 35.92.050. However, City Light argues, and I would hold, that its program is

impliedly authorized as consistent with the express grant to "regulate and control the use, distribution, and price" of electricity. *Id.* A public utility acts within its implied powers if the act "bears 'a sufficiently close nexus to the purpose and object the Legislature intended to serve in granting the power to operate an electric utility,' which is the supply of electricity to the municipality and its inhabitants." *Okeson v. City of Seattle*, 130 Wn. App. 814, 822, 125 P.3d 172 (2005) (*Okeson* II) (quoting *Taxpayers*, 108 Wn.2d at 696). I would hold that there is a more than sufficient nexus between electricity generation and mitigation of the electricity-generated pollution to justify City Light's offset program.

¶34 The ratepayers concede that it is within City Light's authority to mitigate GHG emissions at its own facilities. Appellants' Br. at 17; *see also* majority at 444 ("The appellant ratepayers submitted a brief conceding that City Light has statutory authority to reduce greenhouse gas emissions from its own facilities."). The ratepayers challenge only the *use of offsets* to achieve the mitigation. Appellants' Br. at 3; majority at 444. The trial court found that there was no reason to distinguish between an offset program and reduction of City Light's own emissions because GHGs are immediately mixed in the upper atmosphere upon release and distributed globally. Verbatim Report of Proceedings at 32-33. Academic literature supports this conclusion. *See, e.g.*, ANDREW E. DESSLER & EDWARD A. PARSON, THE SCIENCE AND POLITICS OF GLOBAL CLIMATE CHANGE: A GUIDE TO THE DEBATE 112-13 (2006); Peter Rafaj et al., *Flexible Carbon Mitigation Policies: Analysis with a Global Multi-Regional Markal Model, in* THE COUPLING OF CLIMATE AND ECONOMIC DYNAMICS: ESSAYS ON INTEGRATED ASSESSMENT 261-63 (Alain Haurie & Laurent Viguier eds., 2005). Nonetheless, the majority holds generally that "combating global warming is a general government purpose, albeit a meritorious one, and not a proprietary utility purpose."[7] Majority at 439.

---

[7] The parties did not raise the issue of whether combating global warming *generally* is a governmental or proprietary function. Thus, this court should not address the issue. *See* RAP 12.1(a) ("[T]he appellate court will decide a case only

¶35 The majority's analysis is flawed. Relying on *Okeson v. City of Seattle*, 150 Wn.2d 540, 78 P.3d 1279 (2003) (*Okeson* I), the majority holds that City Light's offset program for GHG mitigation is beyond the authority of City Light because the battle to combat anthropogenic climate change (a.k.a. global warming) is a general governmental function and not a proprietary function. Majority at 439. In *Okeson* I, we considered whether the operation of streetlights was within City Light's authority. *Id.* at 550-51. The *Okeson* I court noted that "[t]he principal test in distinguishing governmental functions from proprietary functions is whether the act performed is for the common good of all, or whether it is for the special benefit or profit of the corporate entity." *Id.* at 550 (citing *Lakoduk v. Cruger*, 47 Wn.2d 286, 288-89, 287 P.2d 338 (1955)). We held that "[p]roviding streetlights . . . is a governmental function because they operate for the benefit of the general public, and not for the 'comfort and use' of individual customers." *Id.*

¶36 Unlike the streetlights at issue in *Okeson* I, City Light's offset program provides special benefits to City Light and its ratepayers *in addition to* the common benefits that reductions in GHGs has for everyone. The ratepayers benefit *specially* from knowing the electricity they consume is not contributing to anthropogenic climate change. Moreover, City Light and the ratepayers both benefit because the offset program allows City Light to operate more efficiently. Generally, GHGs and anthropogenic climate change are externalities of electricity generation—they are costs borne from the activity which are not reflected in electricity rates. *See, e.g.*, Cong. Budget Off., The Economics of Climate Change: A Primer ch. 3, at 23-34 (Apr. 2003); *see also* Garrett Hardin, *The Tragedy of the Commons*, Science, Dec. 13, 1968, at 1243-48. However, the Seattle City Council's required mitigation of the GHGs obliged City Light to internalize these costs. City Light could internalize the costs of

on the basis of issues set forth by the parties in their briefs."). Further, the majority's analysis misconstrues the issue. The only issue before the court is whether City Light's chosen method of reducing emissions is a valid exercise of its express or implied authority.

GHG mitigation either by reduction of GHGs at its own facilities or by purchasing offset credits from other facilities. Because City Light primarily uses hydroelectric power for generation, which does not result in GHG emissions, it is very expensive for City Light to reduce GHGs at its own facilities. The less expensive and more efficient internalization method is for City Light to find less efficient sources of GHGs and pay to have those sources reduced or eliminated. Thus, the offset program actually saves the ratepayers money in comparison with a mitigation program limited to City Light's own facilities and is the most efficient way to achieve mitigation. This relationship also illustrates the strong nexus between the offset program and City Light's express purpose of providing electricity. Because the ratepayers benefit from using the electricity generated by City Light, the ratepayers should pay the costs associated with such power generation.

¶37 This court has already determined that promoting efficiency in energy generation is a proprietary purpose. *Taxpayers*, 108 Wn.2d at 694-95, 696 ("We have viewed the Legislature as implicitly authorizing a municipality to make all contracts, and to engage in any undertaking necessary to make its municipal electric utility system efficient and beneficial to the public."); *Hite v. Pub. Util. Dist. No. 2 of Grant County*, 112 Wn.2d 456, 460, 772 P.2d 481 (1989); *Okeson II*, 130 Wn. App. at 822. Internalizing the costs of GHG emissions via an offset program promotes long-term efficiency and is therefore proprietary in nature and within City Light's implied authority. While the court may not agree with the policy decision to purchase such offsets, it is not this court's place to dictate the policies adopted by municipal corporations, so long as those policies are constitutional and not arbitrary or capricious. *Taxpayers*, 108 Wn.2d at 695 ("[I]f municipal utility actions come within the purpose and object of the enabling statute and no express limitations apply, this court leaves the choice of means used in operating the utility to the discretion of municipal authorities."); *Hite*, 112 Wn.2d at 463 ("[W]e

have traditionally allowed municipal corporations discretion in exercising their proprietary powers so long as their actions are not arbitrary, capricious or unreasonable.").

¶38 The majority's holding also illustrates its misunderstanding of the way in which the offset program is funded. The majority concedes that "the [offset] program may be viewed as a legitimate part of the utility's production of electricity because its purpose is to prevent City Light's production from causing a net increase in global greenhouse gas emissions." Majority at 449. However, it holds that the program is not a proprietary function because "the offset contracts are charged to City Light customers regardless of how much electricity they use." *Id.* at 449. The majority claims that "[u]nder *Okeson* I, there must . . . be a connection between the amount paid and the benefit received by the ratepayer." *Id.* at 449. *Okeson* I does not support this proposition. 150 Wn.2d at 552 (querying whether there was a connection between the amount charged and the benefit received in order to determine if an ordinance imposed a fee or a tax, *not* in order to determine if such a tax was authorized). Even if that were the test, it is nonetheless satisfied in the present case. The ratepayers are assessed fees based on the amount of energy they consume. A portion of these fees is used for City Light's GHG mitigation program. Thus, the more energy a ratepayer uses (and the more GHGs a ratepayer is responsible for producing), the more the ratepayer must contribute to the mitigation program.

¶39 Mitigation of GHGs emitted as a result of the ratepayers' consumption of electricity provides a special comfort to City Light's ratepayers and benefits City Light. The offset program internalizes the externalities associated with electricity generation in the most efficient manner, thus benefiting the ratepayers. Such is necessary for the power market in Seattle to operate with long-term efficiency. We have already determined that promoting efficiency is a proprietary function. Moreover, such a mitigation program is closely connected to City Light's express

purpose—providing electricity. I would defer to City Light's policy decision to purchase offset credits and find the GHG offset program impliedly authorized in City Light's express grant of authority. Accordingly, I respectfully dissent.

MADSEN, BRIDGE, and CHAMBERS, JJ., concur with OWENS, J.

Reconsideration denied July 12, 2007.